# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

801 S. Figueroa St., Suite 1200,  Los Angeles, CA 90017-5569
(213) 622-4441 Tel  ◇   (213) 622-1444 Fax  ◇  www.psmlawyers.com

David B. Parker
Parker@psmlawyers.com
(213) 622-4441

November 30, 2009

**VIA E-MAIL**

Robert M. Gilchrest, Esq.
Baute & Tidus LLP
777 S. Figueroa Street, Suite 4900
Los Angeles, CA  90017-5870

Re:     *In Re Arter & Hadden: Expert Report of David B. Parker*

Dear Mr. Gilchrest:

## SCOPE OF REPORT

Counsel for the Partnerships[1] have requested and I have undertaken to analyze: (1) whether the statutes of limitation ran on any claims[2] by the Partnerships against Ronald D. Lossett ("Lossett")[3]; (2) whether Arter & Hadden, LLP ("Arter") was negligent in delaying action or advising the client with respect to statute of limitations concerns with the result of creating an actual or likely statute of limitations problem for the Partnerships; and (3) the potential implications of the Court's April 28, 2006 ruling in favor of the Partnerships on Lossett's demurrer on statute of limitations grounds.  This report is rendered in compliance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

## BRIEF SUMMARY OF REPORT AND CONCLUSIONS

---

[1]     The "Partnerships" consist of Cape Cod West; Fontana Medical Plaza; Pacific Physician Properties; VMG Building; Hesperia Medical Building; Rialto Medical Building; Aspen Medical Building; and Hauch Medical Building II. Hereafter, they will be referred to collectively as "the Partnerships" or "the clients."

[2]     I have not been asked to undertake, and express no opinion about, the merits of the Partnership claims, noting only that Arter appeared to have advised and believed that the claims were meritorious and that there were provable seven figure damages, as I explain later, it seems clear that Lossett favored the interests of PPSI over the interests of the Partnerships and failed to obtain a guarantee of the Partnerships' leases or enforceable assumptions of those leases.

[3]     Former managing partner of the various partnerships.

# PARKER SHUMAKER MILLS LLP
THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 2

It is my opinion that some or all of the Partnerships' claims were time-barred and that such was a consequence of the negligent handling of the matter by Arter, including its inexcusable delay, failure to adequately research the statute of limitations (as to which the law was relatively clear and settled) and to take heed of the results of the research that the law firm did conduct, and its advice and lack of advice to the client[4], in particular the failure to timely and adequately advise as to potentially impending statute of limitations deadlines, and the options of tolling agreements and litigation to avoid the risk of claims against Lossett being time-barred. Further, the April 28, 2006 demurrer ruling is not inconsistent with these conclusions and should have been taken as a warning and a brief reprieve. The determination to settle, rather than further litigate, given the problems created by the statute of limitations was reasonable.

## QUALIFICATIONS AND COMPENSATION

I am a trial lawyer with 33-years of experience focused in the areas of professional liability and legal ethics, business and professional liability insurance, and commercial litigation.  I have defended and prosecuted hundreds of legal malpractice cases over the course of three decades and have been designated as an expert witness or consultant in standard of care and legal ethics issues well more than 100 times, having qualified to give such testimony in both State and Federal Courts numerous times over the past approximately 18-years.  In addition to my professional practice, I provide loss prevention consulting related services, including in-house law firm seminars, relating to standard of care, legal ethics and the "defensive" practice of law.

I am currently a member of the State Bar's Standing Committee on Professional Responsibility and Conduct as well as the Professional Responsibility & Ethics Committee of the Los Angeles County Bar Association (of which I am the former Chair).  I am also the former Chair of the Attorney's Errors & Omissions Prevention Committee of LACBA.

Both in commercial and professional liability litigation I have litigated for and against the application of the statute of limitations involving the full panoply of business and professional liability tort claims under California law. I have prosecuted and defended attorneys who were accused of failing to timely pursue claims on behalf of claims. I have researched the issues many dozens of times and written dozens of briefs on the issues, including demurrers, motions for summary judgment and trial briefs and trial motions.

---

[4]  The Partnerships allege that on August 24, 2001 Arter advised the clients that the statute of limitations would waived if Lossett sued the Partnerships, which would allow the Partnerships to avoid suing Lossett until after the conclusion of the Caremark Litigation.  Amended Counterclaim ¶ 123.  If true, this advice would be incorrect and/or misleading. The filing of a suit would toll the statute of limitations as to any mandatory cross-claims, but it wouldn't resurrect claims already time barred and though they could be raised by way of offset, time-barred claims could not be asserted by way of affirmative relief.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 3

A substantially complete list of publication authored by me within the preceding more than 10 years follows[5]:

| | |
|---|---|
| Co-Author | *Modifying Fee Agreements, or How I Learned to Stop Worrying and Love California Rule of Professional Conduct 3-300*, Los Angeles County Bar Association Update (May 2009) |
| Co-Author | *Recognizing Interests and Avoiding Conflicts* (2008) |
| Co-Author | *Ethical Issues in Class Actions and Derivative Litigation* (2008) |
| Co-Author | *Practicing Law Defensively* (2007) |
| Co-Author | *Ethics: Beware of Opposing Counsel Bearing "Gifts"*, Los Angeles County Bar Association Update (March, 2008) |
| Co-Author | *The Pellican's Mess: Ethical Considerations for Attorneys Who Hired Private Investigators in the Wake of Pellicano* (September 2006) |
| Co-Author | *"Advising and Defending Corporate Directors and Officers"*, Chapter 12 in Directors' and Officers' Liability Insurance (CEB 2005 and later supplements) |
| Co-Author | *The Unknown Ethical Quagmire Under The New Bankruptcy Law, (Lorman Educational Services December 2005)* |
| Co-Author | *The Informed Consent Doctrine: What's Good for the Patient is Good for the Client*, Los Angeles County Bar Update (December 2005) |
| Co-Author | *Avoiding Ethical Pitfalls for New Attorneys*, LACBA Survival Guide for New Attorneys (September 2005) |
| Co-Author | *The California Rules of Professional Conduct: The Good, the Bad, and the Utterly Confusing*, Los Angeles County Bar Update (May 2005) |
| Co-Author | *Directors and Officers Liability Insurance: A Handbook for Corporate Executives and Their Counsel* (November 2004), published in connection with CEB Seminar, Protecting Corporate Officers & Directors (November 2004) |
| Co-Author | *Legal Ethics and the Limited Liability Company*, Lorman Educational Services, "LLCs: Advising Small Business Start-Ups and Larger Companies in California" (July-August 2004) |

---

[5]  This does not include writings prepared as seminar materials in connection with my speaking engagements, many of which are substantial undertakings not unlike published articles. A substantially complete list of speaking engagements over the past 25 years, as well as other information pertinent to my qualifications, is included in attached resume.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 4

| | |
|---|---|
| Co-Author | *Ethics and Entertainment Law in California: The Essentials*, Film & Television Law Conferences, sponsored by CLE International (June 2004, updated June 2005) |
| Co-Author | *After Attorney Error: What is the Duty to Assist the Former Client in Mitigating Consequences?* Los Angeles County Bar Update (November 2003) |
| Co-Author | *Expert Grilling*, Los Angeles Lawyer (November 2001) |
| Co-Author | *The Never-Ending Story: Malicious Prosecution in California* (January 2001) |
| Co-Author | *Baggage Handling: Conflicts in Law Firm Acquisitions and Mergers*, Quality Assurance Review (Summer 2000) |
| Author | *Practicing Defensive Law in the 1990s* (1996-99) |
| Author | *The Practice of Defensive Law by Corporate Securities Lawyers in the 1990s* (1997), 30th Annual Securities Regulation Conference |
| Author | *Law of Causation in Legal Malpractice Cases*, Consumer Attorneys of California, 34th Annual Convention (1995) |
| Co-Author | *The Law of Directors and Officers Insurance* (1993). |
| Co-Author | *Policy Limits Demands* (1993) |
| Co-Author | *Law Firm Liability Under the Federal Securities Laws*, Insights, Vol. 6, No. 3 (1992) |
| Co-Author | *Vicarious Liability of Law Firms for Member Securities Laws Violations as Lawyers and Directors*, 24th Annual Securities Regulation Seminar (1991) |
| Author | *Current Coverage Issues in Directors and Officers Insurance*, P.L.I. (1991) |
| Author | *Life After Cumis:  The Impact of Cumis and Civil Code Section 2860 on Business Litigation*, LACBA Litigation Section Program on "Recent Developments in Business Torts" (1991) |
| Author | *In Defense of the Litigation Privilege*, California Litigation (Winter, 1988) |
| Co-Author | *Confronting the D & O Insurance Crisis: Corporate Manager's Perspective* (1986) |
| Author | *The Role of Liability Insurance in Securities Litigation*, (P.L.I. Securities Litigation:  Prosecution and Defense Strategies) (1985) |
| Author | *Directors and Officers Liability Insurance:  What You Must Know to Protect Your Client*, (P.L.I., Recent Developments in Securities Litigation) (1984) |
| Co-Author | Note, *Erosion of the Error-in Judgment Rule:  Informed Decision-Making and Informed Consent*, Legal Malpractice Committee Newsletter (November, 1981), International Association of Insurance Counsel |

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 5

| | |
|---|---|
| Co-Author | Note, *Third-Party Indemnity Claims Against Attorneys:  The California Rule and Its Evolution*, Legal Malpractice Committee Newsletter (November, 1980), International Association of Insurance Counsel |
| Author | *Attorney Liability Under the Securities Laws After Ernst & Ernst v. Hochfelder*, 10 Loyola Los Angeles L. Rev. 521 (1977) |
| Co-Author | *Advising and Defending Corporate Officers and Directors Under the New General Corporation Law*, (CEB, 1977) |
| Co-Author | *Liability Insurance Coverage Under the Securities Laws*, (USC Law Center 4th Annual Corporate Law and Finance Institute, 1976) |
| Co-Author | Note, *Beyond the Client:  Attorney Liability to Third Persons*, Legal Malpractice Committee Newsletter (October, 1976), International Association of Insurance Counsel |
| Author | Note, *Juveniles in the Criminal Courts:  A Substantive View of the Fitness Decision*, 23 UCLA  L. Rev. 988 (1976) |

My compensation for study of the issues and evidence, on which I base my opinions, and my testimony to be provided in this case, is $500 per hour.

Below is a list of other cases in which I have testified as an expert at trial, arbitration and/or by deposition within the preceding four years[6]:

1.      Mirch v. Mileikowsky

2.      Zer-Ilan v. Mitchell Silberberg & Knupp

3.      Nardi v. O'Hara & Barnes

4.      Savers Insurance v. Tressler

5.      Karcher Engineering v. Littler, Mendelson

6.      K & N Engineering v. Christie Parker & Hale

7.      Magnandonvan v. City of Los Angeles

8.      I/O Magic v. Horowitz

---

[6]      I have not reviewed records as to the dates of testimony and thus a number of the early listed cases are likely more than four years ago. The list is not entirely in chronological sequence.

# PARKER SHUMAKER MILLS LLP
THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 6

9.      Noble v. Cornell

10.     Nature's Wing v. Loeb, Kosacz & Sundberg

11.     Smylie v. Fagelbaum & Heller

12.     Hamilton v. Landsgaard

13.     Gaggero v. Garcia

14.     Nelson v. Song

15.     Platinum Equity v. McLaughlin

16.     Collins v. Kantor

17.     Gardner Family Trust v. Fenigstein & Kaufman

18.     Specialized Clutch v. Lieff Cabraser

19.     New Century Mortgage v. Liberty Surplus

20.     Litza v. Callahan, McCune & Willis

21.     Sacramento City Unified School District v. Girard & Vinson

22.     Kenne v Stennis

## MATERIALS REVIEWED

| Date | Description |
| --- | --- |
| January 6, 1998 | Memo from Jon Roberts to Jack Goldman, Gary Groves, M.D. re: Various Partnerships – Estoppel Certificates |
| February 2001- September 2002 | Arter Hadden Invoices to Gary Groves, M.D.[7] for Period February 2001 to September 2002 |

---

[7]     General partner in all eight partnerships. First Amended Counter Claim of the Partnerships, ¶ 88.

# Parker Shumaker Mills LLP
## The Lawyers' Lawyers

Robert M. Gilchrest, Esq.
November 30, 2009
Page 7

| | |
|---|---|
| April 23, 2001 | First Amended Complaint by partnerships against Caremark and PPSI |
| June 11, 2001 | Email from Neil Sunkin to Gary Groves, M.D., Jon Roberts, Bruce Newman, Jack Goldman re: Caremark: Response to Mr. Groves' Comments Re Answer to Complaint |
| June 12, 2001 | Email from Neil Sunkin to Jon Roberts re: Caremark: Response to Mr. Groves' Comments Re Answer to Complaint |
| July 11, 2001 | Memo from Sheila Israel to Neil Sunkin, Bruce Newman re: Breach of Leases by Pacific Physician Services, Inc. ("PPSI") and Caremark RX ("Caremark") |
| July 31, 2001 | Email by Jon Roberts to Neil Sunkin[8] (cc Goldman and others) re timing of discovery of reduction of term of Cape Code lease term as it relates to statute of limitations |
| August 10, 2001 | Research Memo by Neil Sunkin to Jack Goldman[9] Re Statute of Limitations as to Potential Claims against Ronald D. Lossett |
| August 24, 2001 | Teleconference Agenda, Jack Goldman, Neil Sunkin, Gary Groves, Jon Roberts |
| December 5, 2001 | Memo from Jon Roberts to Jack Goldman, Neil Sunkin, Gary Groves, Leon Pettijohn Re 1. Responses to Litigation Requests; 2. Availability of Litigation Materials to Partners |
| December 11, 2001 | Email from Neil Sunkin to Gary Groves, Leon Pettijohn and Jon Roberts Attaching Goldman's Memo of 12/11/01 to Jon Roberts, Gary Groves & Leon Pettijohn |
| December 11, 2001 | Memorandum to Gary Groves, Leon Pettijohn, John Roberts, Neil Sunkin from Jack Goldman regarding Involvement of Ron Lossett in Responding to Caremark's Interrogatories. |
| December 13, 2001 | Memo by Jack Goldman to Gary Groves, Leon Pettijohn, Jon Roberts, cc to Neil Sunkin Re Involvement of Ron Lossett in Responding to Caremark's |

---

[8]   1991 admittee and thus a lawyer with 10 years experience when he prepared August 10, 2001 research memorandum.

[9]   1966 admittee

# PARKER SHUMAKER MILLS LLP

### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 8

| | Interrogatories[10] |
|---|---|
| April 28, 2006 | Court demurrer ruling |
| July 14, 2008 | Defendants' Partnerships First Amended Counter Claim |
| March 15, 2007 | Deposition transcript of Neil Sunkin, Vol. I |
| March 16, 2007 | Deposition transcript of Jack Goldman, Vol. I |
| May 18, 2007 | Deposition transcript of Jack Goldman, Vol. II |
| May 3, 2007 | Deposition transcript of Neil Sunkin Vol. II |
| January 5, 2009 | Gertz's Answer to First Amended Counterclaim |
| May 22, 2009 | Groves' Special Interrogatories to Gertz, Set One |
| July 10, 2009 | Gertz's Response to Groves' Special Interrogatories, Set One |
| August 13, 2009 | Deposition of Neil Sunkin Vol. I |
| | GLG-CCW (2134-10) Litigation: Groves, Gary MD: Cape Cod West, et al v Pacific Physician Services, Inc, et al CORRESPONDENCE Vol. 1 6/6/02-7/25/02; Vol. 2 7/26/02-8/15/02; Vol. 3 8/19/02-9/13/02; Vol. 4 9/16/02-11/15/02; Vol. 5 11/14/02-5/15/03 |
| | Chronology of Documents Cape Cod West, et al v Pacific Physicians, Caremark 2000-2002 |
| | GLG-CCW (2134-10) Litigation Groves, Gary MD: Cape Cod West, et al v Pacific Physician Services, Inc, et al DISCOVERY Vol. Tabs 1-19; 17/17/02-8/02/02 |
| | GLG-CCW (2134-10) Litigation Groves, Gary MD: Cape Cod West, et al v Pacific Physician Services, Inc, et al DOCUMENTS 4/25/02 Memorandum from Jon M. Roberts to Groves & Pettijohn, Grajewski and Goldman: |

---

[10]     Curiously it appears at first glance to be the same memorandum as December 11, but with different date.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 9

| | |
|---|---|
| | Caremark & KPC lease obligations |
| | GLG-CCW (2134-10) Litigation Groves, Gary MD: Cape Cod West, et al v Pacific Physician Services, Inc, et al Summons and Complaint Caremark RX, Inc., v Cape Cod West, et al USDC CD Cal ED CV 02-648: Vol. 1 |
| | GLG-CCW (2134-10) Litigation Groves, Gary MD: Cape Cod West, et al v Pacific Physician Services, Inc, et al COURT: Vol. 1; Tabs 1-21; 6/28/02-8/9/02; Vol. 2; Tabs 26-43; 8/9/02-1/28/03 |
| | Gary L. Groves MD v Caremark Rx 65354-1143 Discovery Vol. 1 Tabs 1-5; 9/04/01-9/4/01; Vol. 2 Tabs 6-13; 10/17/01-10/18/01; Vol. 3; Tabs 14-15; 10/18/01-11/1/01; Vol. 4; Tabs 16-40; 11/1/01-12/28/01; Vol. 5 11/14/02-5/15/03; Vol. 6; Tabs 51-57; 1/31/02-2/25/02; Vol. 7; Tabs 58-64; 2/25/02-6/11/02 |
| | Gary L. Groves MD v Caremark Rx 65354-1143 CORRESPONDENCE Emails Vol. 1 10/12/01-1/31/02; Vol. 2 2/10/02-2/26/02; Vol. 3 2/27/02; Vol. 4 2/28/02-3/29/02; Vol. 5 4/1/02-5/10/02; Vol. 6 5/13/02-6/27/02; Vol. 7 6/27/02-7/19/02 |
| | GLG-CCW (2134-10) Litigation Groves, Gary MD: Cape Cod West, et al v Pacific Physician Services, Inc, et al COURT: Vol. 1; Tabs 1-21; 6/28/02-8/9/02; Vol. 2; Tabs 26-43; 8/9/02-1/28/03 |

## OPINIONS AND ANALYSIS

1.  **Issue #1**:     Did the statutes of limitation expire as to some or all Partnership claims against Lossett?

In the last operative complaint,[11] the Partnerships alleged various causes of action against Lossett, including breach of fiduciary duty, constructive fraud, breach of contract and declaratory relief. Below I analyze the applicable statute of limitations for each claim.

   a.  **Lossett's Breaches of Fiduciary Duty**

---

[11]   Third Amended Cross-Complaint and Third Party Complaint for: (1) Breach of Fiduciary Duty; (2) Breach of Contract; (3) Constructive Fraud; and (4) Declaratory Relief.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 10

There is no specific limitations period governing actions for a breach of fiduciary duty under California law.  Therefore, an action for breach of fiduciary duty that does not amount to actual or constructive fraud[12] is governed by the *Code of Civil Procedure* Section 343 "catch all" statute of limitations.  Actions that are not specifically subject to any other statute of limitations (e.g., a breach of fiduciary duty) must be commenced within four (4) years after accrual.[13]  (*Stoll v. Superior Court* (1992) 9 Cal.App.4th 1362, 1366; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 617 at p. 793.)  A breach of fiduciary duty claim may be based on concealment of facts, and the statute therefore begins to run when plaintiffs discovered, or in the exercise of reasonable diligence could have discovered, that facts had been concealed.  (*Stalberg v. Western Title Ins. Co.* (1991) 230 Cal.App.3d 1223, 1230.)

<u>With respect to the Caremark Action</u>[14]: Jack Goldman ("Goldman"), an Arter partner and chief point of contact with the client representatives (Groves and Roberts), admitted in his deposition that, as early as 1998, the Partnerships had claims against Lossett based upon Lossett's mismanagement/malfeasance relating to the Partnerships.  Despite this knowledge and even after Arter filed the Caremark Action on behalf of the Partners (on April 4, 2001) against Pacific Physician Services, Inc. ("PPSI")/MedPartners/Caremark,[15] Arter failed to name Lossett in that lawsuit or any separate action.  Instead, Arter apparently advised the Partnerships not to sue

---

[12]   However, where the gravamen of the complaint is that defendant's acts constituted actual or constructive fraud, the applicable statute of limitations derives from *Code of Civil Procedure* Section 338(d)—a ***3-year*** statute of limitations period.  (*City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 889.)  Here, while an argument can be made that a three (3) year statute of limitations applies because the claims of breach of fiduciary duty are somewhat related with the constructive fraud claim that was alleged, it is likely the Court would view them for what they purport to be—causes of action for breach of fiduciary duty, and thus it would likely apply the four (4) year statute of limitations.  In any event, to be conservative, we've used the longer term of four (4) years. Arter appears to claim that the law was unsettled on relevant statute of limitations issues. This would qualify as more debatable than unsettled but regardless, the effect of the uncertainty should cause the attorney to (a) disclose the uncertainty to the client as a risk factor; (b) resolve doubts by using the shorter time period for purposes of strategy decisions.

[13]   Indeed, on April 28, 2006, Judge J. Michael Gunn (in ruling on Lossett's Demurrer to the Partnerships' Second Amended Cross-Complaint and Third Party Complaint (p.4:23-27)) noted that "the statute of limitations for breach of fiduciary duty is four years…Here, the complaint was filed on May 28, 2004.  The bar date would be four years preceding that date or May 28, 2000.").

[14]   *Cape Cod West v. Pacific Physician Services, Inc.*, San Bernardino County Court Case No. SCVSS 076186 (the "Caremark Action"). The original complaint was filed April 4, 2001, and the First Amended Complaint was filed shortly thereafter on April 23, 2001.

[15]   Counterclaim ¶ 105. MedPartners became Caremark. By this IME PPSI was essentially a shell corporation with no assets as 'Caremark had sold its California operations and other material assets to an unqualified party that filed bankruptcy. Id. 107.

# Parker Shumaker Mills LLP
### The Lawyers' Lawyers

Robert M. Gilchrest, Esq.
November 30, 2009
Page 11

Lossett until the Caremark Action concluded.  As the Partnerships' agent,[16] what Arter knew or should have known is imputed to the Partnerships for purposes of the discovery trigger[17] and if the wrongful act has otherwise caused actual injury (discussed below) starts the clock ticking for statute of limitations purposes.  **As such, the statute for any such claims would have run in 2002—four (4) years from 1998.**

With respect to the Lossett Action[18]: Regarding the Cape Cod West Partnership, the four (4) year statute of limitations was likely triggered in July 1997 when Lossett reported to the Cape Cod West ("Cape Cod") partners that MedPartners would not honor the twenty (20) year term of the amended Cape Cod lease.[19]  Goldman acknowledged contemporaneously receiving Lossett's July 1997 memorandum.  Furthermore, Goldman acknowledged that based on the memorandum, he was aware that the value of the Cape Cod property would be affected because Cape Cod would have to find a new tenant if MedPartners vacated the property on November 1, 1999. **The claim of Cape Cod for damages proximately caused by Lossett's unauthorized lease**

---

[16]   Basic concepts of agency law combined with *Civil Code* Sections 18 & 19, dictate that once a principal's agent is on notice, the principal is on notice.  (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 875 (a statute of limitations case holding that once a plaintiff's attorney suspects wrongdoing, the plaintiff herself is thereafter on inquiry notice.  If plaintiff's attorneys choose "not to pursue their inquiry further despite their suspicions, [plaintiff] is charged with knowledge of facts which would have been revealed if [plaintiff] pursued the investigation.");  *Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 129 (a professional negligence/statute of limitations case holding that the knowledge of an attorney (and its agents) is imputed to the attorney's client); *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 900-02 (concluding that the "discovery" limitations period for a *Code of Civil Procedure* Section 340.5 claim was not "delayed, suspended or tolled when a plaintiff with actual or constructive knowledge of the facts underlying his malpractice claim is told by an attorney that he has no legal remedy."  A client is charged with the lapses of attorneys acting on the client's behalf); *Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 828 (recognizing the general agency principle "that an attorney is his client's agent, and that the agent's knowledge is imputed to the principal even where…the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact [citations omitted]…In civil cases, '[t]his constructive notice, when it exists, is irrebutable.' (citing *Powell v. Goldsmith* (1984) 152 Cal.App.3d 746, 751).").)  Thus, Goldman's knowledge is the equivalent of the Partnerships' knowledge.  This is a fundamental precept of statute of limitations law and should have been well known to Goldman and his firm. It also means that Goldman would be a key witness potentially in any litigation with Lossett, a fact which should also have been disclosed to the clients.

[17]   There was nothing unsettled or debatable about this proposition under California law which has been clear for more than 30 years, including by Supreme Court precedent. See footnote *ante*.

[18]   *Lossett v. Cape Cod West, et al.,* San Bernardino Superior Court Case No. RCV 080897 (the "Lossett Action").

[19]   In his deposition, Goldman even acknowledged that the statute of limitations clock may have begun running in July 1997.

# PARKER SHUMAKER MILLS LLP

THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 12

**amendments was likely barred by the statute of limitations as of July 2001—four (4) years from July 1997**.[20]

Pacific Physician Properties' ("PPP") Claims against Lossett:  It seems clear that Lossett favored the interests of PPSI over the interests of the Partnerships and failed to obtain a guarantee of the Partnerships' leases or enforceable assumptions of those leases.  Based on a four (4) year statute of limitations, **as of January 6, 2002, it would appear that those claims were also barred by the statute of limitations**.[21]

To the extent that discovery is a triggering requirement of the statute of limitations for these claims, as I believe is and was clear under applicable law[22], it appears that there was clear discovery—based on an actual or constructive knowledge standard, particularly taking into account imputed knowledge of the agents of the Partnerships, including Arter itself.

As to damages, the impairment of partnership rights by Lossett was almost certainly a form of actual injury for purposes of triggering the statute of limitations.  Independent of the loss of legal rights, as I explain in the second part of this report, it appears to me that Arter's charge was to take steps to protect the Partnerships from the adverse consequences of Lossett's misfeasance and that such legal expenses would likely be recoverable as consequential, mitigational damages under California's "Tort of Another" Doctrine.  If this understanding is correct, then under settled case law as of 1998, Arter's fees would be a separate and independent damage trigger for statute of limitations purposes.

---

[20]   Caremark filed suit against Lossett for misconduct and malfeasance as an officer of PPSI at this time.

[21]   In or about December 1997, the Partnerships' properties were being managed by Jon Roberts ("Roberts").  At that time, Roberts' management of the Partnerships' properties had only recently begun and Roberts was not yet fully conversant with the files, operations and overall management history of the Partnerships.  Soon, however, Roberts had discovered that Lossett had failed to obtain any assignment/assumptions/guarantees of the leases when MedPartners merged with PPSI (the prior tenant).  Roberts brought this question of MedPartners' liability as to the Partnership leases (and hence, Lossett's breach) to Arter's attention on January 6, 1998.  Thus, at the latest, the applicable statute was likely triggered on January 6, 1998.

[22]   I think the law was clear during the period Arter represented the Partnerships that the statute of limitations on claims against, Lossett, the former managing partner, who after all occupied a fiduciary position, would be tolled during a period that the other partners or their agents were unaware of the existence of the claims.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 13

From the facts presented,[23] it seems clear that Arter was hanging its hat on the "possibility" that the Court would find that, "as a matter of law, no cause of action had yet accrued because no actual pecuniary loss had been sustained" as to all potential causes of action (fiduciary duty and otherwise) against Lossett.  However, it is undisputed that Arter did not consult with an attorney, consultant or expert competent to opine on this extremely important issue nor does it appear that Arter performed timely or adequate legal research was done in support of this supposition.[24]  Nor did Arter attempt (on the Partnerships' behalf) to file an action, seek a tolling agreement[25] or discuss this issue with the Partnerships in a timely manner.  It is the legal standard in this community for business litigation attorneys to act preemptively and proactively to avoid, wherever possible, handing the defendant a potential statute of limitations defense—either by filing the lawsuit or obtaining a tolling agreement, either one of which will stop the clock.  It is also the duty of counsel to inform the clients of any meaningful degree of risk involved if no action is taken and where the risk of such a defense does exist, to apprise the client and evaluate the risk.  If the existence of such a defense is a function of the attorney's neglect, this too must be

---

[23] Including the fact that on August 10, 2001, Arter created an internal memorandum (which it inexplicably refused to share with the Partnerships, despite the Partnerships continual request for such information and the law firm's duty to communicate significant developments under California Rules of Professional Conduct Rule 3-500 and the fact that the work product was paid for by the clients) relating to various statutes of limitation issues concerning the Partnerships which concluded that Arter was unsure of when various statutes of limitations began to run and even went so far as to indicate that certain statutes of limitation may have *already* run.  Yet as recently as June 11, 2001, Sunkin e-mailed the clients that the firm was not aware of any statute of limitations defenses. If the firm was truly unaware, it was because the firm had not timely considered the issue, despite the fact that some statutes might already have run, as early as 2000.

[24] Even if the law is unsettled on an important proposition of law, the attorney has a duty to inform his or her advice based on reasonably diligent legal research. See the Supreme Court decision of *Smith v. Lewis*, 13 Cal.3d 349, 530 P.2d 589, 118 Cal.Rptr. and a later case, *Davis v. Damrell*, 119 Cal.App.3d 883, 174 Cal.Rptr. 257, which applied the teachings of *Smith*.

[25] Tolling agreements are frequently used in cases where the parties have a common adversary and mutually desire a favorable outcome of other pending litigation with such adversary. Even the law firm here, Arter, entered into a tolling agreement with respect to the claims now being made against them. A tolling agreement would have allowed the Partnerships to achieve a balance in their objectives: (1) incentivize Lossett to support the Partnerships' position in the Caremark litigation and alleviate him from having to fight on two fronts; and (2) protect the statute of limitations for claims against Lossett if the Caremark litigation turned out badly for the Partnerships. It appears that no such recommendation was made to the clients and no such proposal was made to Lossett. There would have been no downside risk in proposing such an arrangement to the client and, most important, to Lossett. After all, Lossett had already been terminated and the risk of Partnership claims against him would have been quite obvious. If he refused, an action could be brought to stop the running of the statute of limitations and, if advisable, a court-ordered stay of that litigation pending resolution of the Caremark litigation could have been sought.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 14

acknowledged in discharge of the attorney's fiduciary obligations.  As explained in the second part of this letter, I believe Arter failed to fulfill these obligations.

> **b.** **Constructive Fraud claim against Lossett:**

A three (3) year statute of limitations applies to an "action for relief on the ground of fraud or mistake."  (*Code of Civil Procedure* § 338(d).)  The *Code of Civil Procedure* Section 338(d) limitations period has been held applicable to actions for fraudulent breach of fiduciary duty: *Code of Civil Procedure* Section 338(d) applies where the fiduciary's acts constitute actual or constructive fraud.  (*City of Vista v. Robert Thomas Securities, Inc., supra,* 84 Cal.App.4th at p. 889.)  Actual damage is an element of a fraud cause of action, and thus the cause of action does not accrue until damages have been sustained.  The mere threat, or even probability, of future harm is inadequate to trigger accrual.  (*Id.* at p. 886-87.)[26]

The fraud claim in the operative pleading is pleaded somewhat generally and only references that "Lossett concealed material facts from [the Partnerships] concerning, among other transactions by Lossett as the managing general partner through from 1984 to December 4, 1997[27], the Rialto and Hesperia Lease Addenda."  As such, it is only possible to focus on those two (2) specific allegations of fraud.  While the complaint does not identify the exact date of discovery of fraud by Lossett regarding the Hesperia lease, in context it reads that Lossett continued to hide his role in the unauthorized Hesperia lease addenda even after the filing of the Caremark Action on April 4, 2001.  As such, there is no definitive date of discovery of the fraud here.  Regarding the unauthorized and fraudulent Rialto lease addenda, the complaint indicates that the Partnerships did not discover "competent evidence of the [existence of the] Rialto Lease Addendum until in or about September 2002."  However, even this statement is not a definitive allegation that in September 2002, the Partnerships became aware of Lossett's fraudulent concealment and that the Partnerships had suffered actual damages.  However, if that is the case, at least with respect to the fraud associated with the Rialto lease, **the statute of limitations would have expired three (3) years from such discovery—in September 2005**.

> **c.** **Declaratory Relief claim against Lossett:**

---

[26]    As your own research indicates, Arter did not consult with an attorney, consultant or expert competent to opine on this important issue.  Instead, Arter merely continued to do nothing as it relied upon the ***possibility*** that a Court "**may**…determine [ ]…that no cause of action has yet accrued because no actual pecuniary loss has been sustained."  (Arter's August 10, 2001 internal memorandum, p.1 (emphasis added).)

[27]    Partnerships'' First Amended Counter-Claim ¶ 25-26. Lossett resigned as managing general partner on this date and Groves took over. Counterclaim ¶ 93. Lossett was also an officer of PSSI from 1983-96. Id. ¶ 27. The Partnerships sued Lossett on this date per authorization from Gary Groves (*Groves v. Lossett*) but was dismissed in February 1998 on advice of Arter. Id. ¶91.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 15

The statute of limitations governing a declaratory relief action is one applicable to an action on the underlying claim: i.e., the "period of limitations applicable to ordinary actions at law and suits in equity should be applied in like manner to actions for declaratory relief."  (*Maguire v. Hibernia Sav. & Loan Soc.* (1944) 23 Cal.2d 719, 734.)  Since the statute of limitations on the declaratory relief claim is governed by the statute of limitations on the underlying claims, this cause of action is equally time-barred as it relates to the causes of action for breach of fiduciary duty, breach of contract and fraud.

> ### d.  <u>Breach of Contract claims against Lossett</u>:

Except where a statute provides otherwise, an action on "any contract, obligation or liability founded upon an instrument in writing" must be commenced within four (4) years after accrual of the action."  (*Code of Civil Procedure* § 337(1).)  Moreover, under the discovery rule recognized by California Courts, a cause of action accrues when the plaintiff discovers or could have discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of action.  (*Perez-Encinas v. AmerUs Life Ins. Co.* (ND Cal. 2006) 468 F.Supp.2d 1127, 1134; *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 179.)

Here, it appears clear that Lossett breached the PPP Partnership Agreement, by-laws and Articles by failing to pursue PPSI in connection with its default on the 1995 lease amendment, concealing/obfuscating from PPP that the amendment even existed, and diverting monies to himself in connection with purported tenant improvements that would have otherwise been constructed at the PPP property and added value to the property.  Furthermore, it appears that Lossett breached the Cape Cod Partnership Agreement by engaging in a number of acts, including causing false and misleading financial disclosures to be filed with the United States Securities and Exchange Commission ("SEC") regarding the terms of the Cape Cod building leases.[28]

Based upon the documents I reviewed, I was unable to identify the date that the Partnerships discovered or could have discovered the SEC reports and breach of the PPP organizational documents however, with respect to the Cape Cod Partnership Agreement, the facts indicate that commencing in or about November 1991 and continuing through in or about December 1995, Lossett (and others) caused the term of the Cape Cod lease to be publicly reported in various PPSI SEC filings as expiring in November 1999 (instead of November 2009).  Since these SEC documents are public documents, a fair argument can be made that the Partnerships are presumed to have had constructive notice of these filings and, as such, **the four (4) year statute**

---

[28]   Again, I have not performed an independent analysis of the liability issues in the underlying action but comment on the claims and summary of evidence which certainly point forcefully in that direction.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 16

**of limitations would have expired in December 1999** given that the last alleged SEC reporting was in December 1995.

**<u>Conclusions:</u>**  First, it would appear that Lossett's statute of limitations defenses were meritorious given the facts and dates that I have been provided.  Second, it appears that these statutes of limitation ran on each of these claims against Lossett on Arter's watch.[29]  Third, from a standard of care standpoint, as I explain below, it was careless and irresponsible of Arter to take the chances that they did with the Partnerships' rights as to Lossett.  In my opinion, Arter was compelled (and failed) to determine the earliest possible date for the running of any of these statutes of limitation in order to resolve any doubts ahead of such deadlines.  Fourth, it does not appear that Arter timely advised the Partnerships of the applicable statutes of limitation as to Lossett or the risks associated with Arter's claimed strategy.  Indeed, the facts support the contrary—overt reckless behavior on Arter's part as Arter failed to timely file a complaint against Lossett on behalf of the Partnerships, obtain a relevant tolling agreement[30] or obtain the Partnerships' informed written consent not to proceed in these matters.[31]  Fifth, the relevant law

---

[29]  Arter began representing the Partnerships in December 1997.

[30]  According to Sunkin, the possibility of a tolling agreement was considered and discussed internally, at least between him and Goldman. Sunkin deposition p. 56. This would have been a sensible step in there was concern about the implications of suing Lossett while the Caremark litigation was still ongoing. In all events, the decision belongs to the client and the lawyer's duty is to facilitate an informed decision, particularly if the client is put in the dilemma of choosing between alienating Lossett and harming the pending litigation and giving up claims against Lossett if the litigation doesn't fare well. There is a time entry for August 2, 2001 regarding a communication with opposing counsel regarding a letter he had written regarding a tolling agreement. Presumably this would not involve tolling claims against Lossett. There is also a September 28, 2001 entry, including communications with clients but, again, no indication such involved partnership claims against Lossett. There is a later, November 2, 2001 entry but there the tolling agreement is to be with Caremark and HDMG.

[31]  If the client dictates that Lossett should not be targeted while the Caremark litigation is pending (and it appears this was not so much the dictate of a client but the advice of the Arter firm), a tolling agreement is a good way to strike the balance. If there is a risk such that the client may lose its ability to pursue affirmative claims against Lossett because of the strategic delay, the client must be advised of the risk, so that an informed judgment can be made. A tolling agreement would have put Lossett on notice of potential claims against him, to be sure, but it would also have incentivize him to help the client achieve a satisfactory outcome so that no claim would be made against him. A tolling agreement doesn't involve throwing down the gauntlet but represent a balancing of interests. Arter appears to cast blame on the management of the Partnerships, presumably Roberts and Groves, based on one or more of its affirmative defenses. Arter was served with Special Interrogatory 6 which sought all facts upon which the contention is based. The response was totally inadequate and does not even reference decisions relating to the statute of limitations and does not offer anything but a conclusion that the firm "fully advised" the clients. The same is true of Arter's responses to Special Interrogatory 8 and 11. I reserve the right to address and express opinions as to these and any other issues which Arter has failed to properly address in its responses to special interrogatories.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 17

on the statute of limitations issues presented in this situation was relatively clear and settled (as to the applicable statutes, tolling based on non-discovery, and what damage (nature and quantum) is sufficient to give rise to an accrued and actionable claim and thereby trigger the statute of limitations). Even if the law was arguably uncertain, Arter's research was untimely and inadequate. Finally, if Arter regarded the law as uncertain, it owed a duty to advise the client of that conclusion[32] and advise on a strategy that would obviate the uncertainty by acting sooner, whether to seek a tolling agreement or initiate litigation earlier.[33]

**2.  Issue #2:**   Did Arter's negligence create an actual or likely statute of limitations problem for the Partnerships?

Given some of the discussion above, this issue somewhat dovetails into the prior issue.  "(A)n attorney is subject to liability for malpractice when his or her negligent investigation, advice, or conduct of the client's affairs results in loss of a meritorious claim."[34]  (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1092.)  The elements of a cause of action for attorney malpractice are: (1) the duty of the attorney to use such skill, prudence and diligence as members of the profession commonly possess; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage.  (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200.)

   **a.     Duty of Care**

---

[32]   Especially as Arter had advised the client as recently as June 11, 2001 that it did not see any statute of limitations problems. Sunkin e-mail dated June 11, 2001.

[33]   In Special Interrogatory No. 5, Arter was asked to state all facts upon which it based its defense under the Judgmental Immunity Rule. Likewise, Arter was asked in Special Interrogatory No. 13 to state all facts on which it based its defense that it did not commit malpractice. The responses are totally inadequate. The responses fail to identify what issues were unsettled, whether there were contradictory appellate precedents or simply the absence of applicable appellate decisions, what legal research the firm performed to arrive at that conclusion, or any other facts from which Arter could show it exercise informed judgment. Nor does Arter appear to contend that it shared its conclusion—assuming it was of that frame of mind—with the client, which was their fiduciary duty. I reserve the right to address and express opinions as to these and any other issues which Arter has failed to properly address in its responses to special interrogatories.

[34]   While there is a paucity of case law on this issue, in our view if a lawyer's neglect creates a serious and substantial statute of limitations defense, the client is privileged to settle on the best terms available rather than going the distance and risk suffering a total loss if the statute of limitations defense succeeds.  There is a serious question whether the merits of the statute of limitations defense must be resolved in the ensuing malpractice case and, if so, who has the burden of proof.  In our view, it is enough to prove the lawyer was negligent, the client at risk and the client acted reasonably in mitigation.  If the merits of the defense must be resolved, there is a cogent case for imposing the burden of proof on the party responsible, the negligent attorney.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 18

"In performing legal services for a client, an attorney has the duty to have that degree of learning and skill ordinarily possessed by attorneys of good standing, practicing in the same or similar locality and under similar circumstances.  It is his further duty to use the care and skill ordinarily exercised in like cases by reputable members of his profession practicing in the same or a similar locality under similar circumstances, and to use reasonable diligence and his best judgment in the exercise of his skill and the accomplishment of his learning in an effort to accomplish the best possible result for his client.  A failure to perform any such duty is negligence."  (*Smith v. Lewis* (1975) 13 Cal.3d 349, 355, fn. 3.)  See California Rules of Professional Conduct Rule 3-110.  An attorney is expected to possess knowledge of those plain and elementary principles of law commonly known by well-informed attorneys.  In addition, an attorney is expected to discover additional rules of law which, although not commonly known, may readily be found by standard research techniques.  (*Id.* at 358.)  The applicable statute of limitations and the basic precepts governing each limitation period should be well known to experienced business litigation attorneys.

> b.    **Breach**

In the present case, Arter failed to bring the Partnerships' claims against Lossett within the allotted limitations period, failed to obtain a tolling agreement with Lossett over potential claims and failed to obtain the Partnerships' informed consent to delayed prosecution with knowledge of the risks and the alternatives to eliminating or mitigating the risk.  In my view, Arter breached its duty to the Partnerships and fell well below the applicable standard of care in all of these respects.

In July 2001[35], well after the Caremark Action was filed, a newly admitted junior Arter associate discovered that Arter had not properly protected the Partnerships from default on the leases to PPSI/Caremark and possibly Lossett.  The young associate found that in the type of merger present with PPSI/Caremark, "the acquiring company [Caremark] does not automatically assume the liabilities of the target company [PPSI] and those liabilities do not become the liabilities of the acquiring corporation by operation of law."  This research supported Caremark's colorable argument that it had "no responsibility as lessee."  Arter had been aware of this possible issue since January 6, 1998—although it allowed the Partnerships to believe that it was a non-issue.  Arter was aware that Lossett had failed to obtain any assignment/assumptions/guarantees of the leases when MedPartners merged with PPSI (the prior tenant), thus creating a question of MedPartners' liability regarding the Partnership leases.  Goldman never considered whether this

---

[35]    In what is perhaps the earliest time entry relating to statute of limitations research regarding claims against Lossett is July 27, 2001, by Neil Sunkin. There are other entries in August by Sunkin including reference to a memorandum regarding statute of limitations (though not specific reference to Lossett claims until the August 10 entry).

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 19

could affect the value of the Partnerships' property or whether this was a fact that would have to be disclosed to a prospective purchaser of a property owned by the Partnerships.

While Arter did eventually perform some research into the statutes of limitation as they related to the Partnerships' claims against Lossett, such action did not take place until in or about July 2001[36]—at approximately the time some of the first statutes of limitation were about to expire on the breach of fiduciary duty claims against Lossett and *several years* after the Partnerships were likely barred from bringing their breach of contract claims against Lossett.  Interestingly enough, Arter incorrectly concluded that (with respect to the potential breach of fiduciary duty claims against Lossett) the statute of limitations was for three (3) years based upon *Code of Civil Procedure* Section 338.  This inaccurate research[37] only serves to underscore Arter's careless approach; here, they had assumed they had one (1) year less than they actually did, and yet they *still* did nothing to protect the Partnerships' rights as to Lossett.

In the August 10, 2001 Research Memorandum (the "Memo") prepared by supervising attorney Neil Sunkin and sent to Goldman[38], the partner in overall charge and primary point of contact

---

[36]  One month after assuring the clients there were no statute of limitations problems. See Sunkin June 11, 2001 e-mail. Still, it appears, the clients remained somewhat apprehensive and on June 29, 2001 and again on July 19, 2001 Roberts asked Arter to evaluate the statute of limitations issues. See Amended Counterclaim ¶ 116.

[37]  Even a cursory glance at the statutes would have revealed that the applicable statute of limitations was four (4) years under *Code of Civil Procedure* Section 343.

[38]  A brief summary of the facts Arter recited and reviewed in the Memo:

(1) Cape Cod Lease ("CCL"): **11/9/1989**—Lossett (managing general partner of Cape Cod) and Dr. Groves (president of PPSI) execute a lease for 120 months; running from 11/9/1989 to 11/9/1999.  Thereafter, on or about **3/11/91**—Lossett, Dr. Groves and Lyons (Vice President of PPSI) execute a modification to the CCL ("Addendum 1") to 240 months; running from 11/9/1989 to 11/9/2009.  **11/19/1995**—Lossett and Carpenter (PPSI) secretly execute a separate "Lease Addendum" that provides for an additional five (5) years on the original CCL with an option for an additional five (5) years; running from 11/9/1989 to 11/9/2004 (with an additional five year option).

(2) Hesperia Medical Building ("HMB") Lease ("HMBL"): **9/1/1992**—Lossett (for HMB) and Dr. Groves (President of PPSI) execute HMBL for a 25 year term; running from 8/1/1992 to 11/1/2017.  In **1993**, Lossett and PPSI looked into reducing the 25 year term to a 10 year term, but the lenders would not allow such a reduction.  Also, in **1993**, Lossett (managing general partner of HMB & CFO of PPSI) and Lyons (officer of PPSI that reported directly to Lossett) secretly executed an "Addendum" which reduced the HMBL term to ten (10) years; running from 8/1/1992 to 11/1/2002.

(3) Discovery: **7/26/1997**: Lossett drafts a memorandum to the Cape Cod Partnership regarding Addendum 1 to the CCL informing all that no copy of Addendum 1 was ever given to MedPartners and hence, MedPartners does not recognize the twenty (20) year term beyond the original lease term which expires in 11/1999.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 20

with primary client representatives (Groves and Roberts), Arter came to the conclusion that "there is a possibility that a determination would be made that the causes of action against Lossett have not yet accrued" because, it concluded, that the Partnerships had not suffered any actual pecuniary loss at that time and thus, they were "not harmed merely by a reduction in the terms of the lease."  Arter postulated that "[a]t this time, it is not determinable that the reduced lease terms have resulted in damage to the partnerships."  However, ***in the very next sentence*** of the Memo, Arter concedes that there is a very real possibility that a trier of fact ***would*** find that the Partnerships ***were already damaged*** by the reduction in the lease terms.  In fact, Arter's contra analysis does not end there-- it continues on for two (2) more paragraphs and even assigns a percentage of probability as to when the cause of action for the Hesperia Addendum and the Cape Cod lease likely accrued.[39]

In reaching its conflicting dual conclusions, Arter primarily relied upon: *City of Vista v. Robert Thomas Securities, supra,* 84 Cal.App.4[th] at 887 (a fraud/breach of fiduciary duty case holding that a plaintiff must suffer actual pecuniary loss; further holding that it was a triable issue of fact as to *when* the city suffered monetary loss); *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4[th] 1226, 1240 ("If the plaintiff and defendant are in a confidential relationship there is no duty of inquiry until the relationship is repudiated."); *Sherman v. Lloyd III* (1986) 181 Cal.App.3d 693, 698-99 (a rescission and restitution case wherein the Court held that "[O]nce the plaintiff

---

**6/8/1998**: Roberts drafts a memorandum to Dr. Groves regarding Roberts' review of the CCL wherein Roberts identifies a discrepancy between Addendum 1 and the Lease Addendum.  **8/5/1998**: Lossett drafts a memorandum to Roberts which comments upon a 7/20/1998 memorandum prepared by Roberts and a follow-up memorandum by Ken Stream (the Partnerships' attorney at some point).  Lossett states that he understands Roberts to believe that the CCL will terminate in 2004.  In this same memorandum, Lossett states that the HMBL terminates in 2002 (Lossett does not mention that the ***reason*** the HMBL terminates in 2002 is because of his secret Addendum).  In **early 1999**, Roberts (as the Partnerships' agent) compares expiration dates of loans with the corresponding expiration dates of major tenant leases and notices a peculiar fact--the CCL and HMBL expire ***before*** the dates on their corresponding loans.  Roberts reports this information to Dr. Groves and Leon Pettijohn.  Further, Roberts discovers that both the CCL and HMBL had been assigned to their respective lenders and that consent of these lenders was required for any lease modification pursuant to the recorded assignments to these lenders.  **1999**: Roberts contacts Ken Stream ("Stream") and Stream provides Roberts with documents relating to the 1993 consent request for HMBL made to the lender and the lender's denial.  No documents could be located regarding any communications regarding the CCL.

[39]  Arter concluded that if it is determined that the Partnerships were damaged by the reduction in lease terms, then "there is an 80% probability that the cause of action related to the Hesperia Addendum would accrue in 1999 when [Roberts] did his analysis comparing the terms of the leases with the maturity dates of the loans" and "[with respect to the Cape Cod lease] there is a 60% probability that a trier of fact would conclude a cause of action accrued when [Roberts] did his analysis comparing the terms of the leases with the maturity dates of the loans in early 1999."  Arter does not even attempt to support its probability analysis with any rationale or authority.  See, the Memo p. 11.

# PARKER SHUMAKER MILLS LLP
## THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 21

becomes aware of facts that would make a reasonably prudent person suspicious, the duty to
investigate arises, and he may then be charged with knowledge of facts that would have been
discovered by such an investigation."); *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412 (a
fraud case holding that the duty of inquiry arises "when plaintiff is aware of facts which would
make a reasonably prudent person suspicious."); and *Mortimer v. Loynes* (1946) 74 Cal.App.2d
160 (discussing the discovery rule where defendant acted in a fiduciary capacity to the plaintiff).

Of the cases Arter reviewed, it cites only one (1) case in support of its conclusion that the
Partnerships had yet to accrue any damages--C*ity of Vista*.[40]  Arter's alternative conclusion
(recognition that "a very compelling argument could be made" that the causes of action had
already accrued "in the beginning of 1999"[41] and hence, the statutes of limitation had already
begun to run as of this date) is admittedly supported by ***each*** of the other cases it reviewed!

Equally disproportionate is the time spent analyzing the two (2) contrasting conclusions.  Arter
dedicates exactly one (1) paragraph in its fourteen (14) page Memo analyzing its support for its
conclusion that the Partnerships had yet to accrue a cause of action.  In that single paragraph,
without any solid support, Arter concludes that "no harm occurred until it is determined by the
Court in the present action against Caremark, that the addenda are valid, that the terms of the

---

[40]   In *City of Vista*, the City brought claims for intentional and negligent misrepresentation, fraud, breach of
fiduciary duty, negligence and breach of implied covenant of good faith and fair dealing against a securities
broker-dealer, relating to the City's purchase of securities known as "interest-only strips."  The trial Court
granted summary judgment of broker-dealer and the City appealed.  The Court of Appeal ultimately held that it
was a genuine issue of material fact as to when the City suffered monetary loss which precluded a summary
judgment determination of when the City's claims accrued for statute of limitations purposes.  Moreover, *City
of Vista* merely stands for the self-evident proposition that, "the cause of action does not accrue until the
damages have been sustained.  (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., supra,* 1 Cal.3d at p.
597.)  'Mere threat of future harm, not yet realized, is not enough.'  (Ibid.)"  (*City of Vista v. Robert Thomas
Securities, supra,* 84 Cal.App.4th at p. 887.)  The case does not support Arter's conclusory reasoning that, "no
harm occurred until it is determined by the Court in the present action against Caremark, that the addenda are
valid, that the terms of the leases are reduced, and that the rental rates in the lease would have yielded a greater
return over the term of the lease than the market rate would have for the same period of time."  (See, the Memo
p. 11.)  Arter cites to no cases that would enable it to make this leap of reasoning that damage accrual would
only occur upon the Court's determination of other issues, that while they may be related, are not inextricably
intertwined.  To be sure, California law was in direct opposition to the conclusion drawn by Arter.  By 1995
(well before Arter began any research on the subject), the California Supreme Court had firmly "established
[that the] the determination of actual injury does not necessarily require some form of adjudication, judgment,
or settlement."  (*Jordache Enterprises, Inc. v. Brobeck. Phleger & Harrison* (1998) 18 Cal.4th 739, 755
(*referring to Adams v. Paul* (1995) 11 Cal.4th 583, 588 (lead opn. of Arabian, J.); *Id.* at p. 595 (conc. opn. of
Kennard, J.)).)  Arter's conclusion to the contrary is befuddling.

[41]   Arter was first consulted by the Partnerships in 1999. Counterclaim ¶ 102. However, the firm had represented
the Partnerships going back to 1997.

# PARKER SHUMAKER MILLS LLP
THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 22

leases are reduced, and the rental rates in the lease would have yielded a greater return over the term of the lease that the market rate would have for the same period of time."[42]  This is in sharp contrast to the ***seven (7) paragraphs*** Arter spends discussing the authority for the validity of an argument that damages have already accrued and the dates the respective statutes of limitation began to run.

Regarding its "alternative" conclusions, Arter concluded that the Partnerships could be found to have accrued actual damages (and that such damages were discovered) in the following areas with the statutes beginning to run on the following dates: (1) CCL Addendum 1 (July 1997);[43]

---

[42]  Here, Arter's analysis erred in failing to distinguish between ***the fact and knowledge of damages*** suffered by the Partnerships and the ***amount*** of damages they suffered.  "Our courts have long held that 'it is uncertainty as to the fact of damage, rather than its amount, which negatives the existence of a cause of action.'"  (*Smith v. SHN Consulting Engineers & Geologists, Inc.* (2001) 89 Cal.App.4th 638, 651 (*citing Walker v. Pacific Indemnity Co.* (1960) 183 Cal.App.2d 513, 517 ); *Sindell v. Gibson, Dunn & Crutcher* (1997) 54 Cal.App.4th 1457, 1470 (A legal malpractice action brought by daughters of decedent's first marriage against the law firm and attorneys that had prepared and documented decedent's estate plan and inter vivos transfers to the daughters, in which daughters sought recovery of costs incurred in defending litigation brought by the children of decedent's second wife.  The Court of Appeal held that the attorneys' fees and litigation costs incurred by the daughters in defending the suit, was injury resulting in accrual of a legal malpractice claim, even though the underlying action was still pending.  "The outcome of the pending [underlying] litigation will not determine whether or not plaintiffs have suffered actual injury, it will only determine the *amount* of that injury…That plaintiffs have already incurred substantial attorney's fees in defending the pending litigation is established fact.  These fees are clearly damages resulting directly from the alleged negligence of defendants.");  *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 227 (holding that an existing injury is not contingent or speculative simply because future events may affect its permanency or the amount of monetary damages eventually incurred).)  As discussed in greater detail *infra*, the Partnerships can be seen to have suffered actual, existing injuries prior to any further adjudication in the Caremark Action (e.g., accrual of attorneys' fees; failure of MedPartners to pay rent and vacation of the premises on April 1, 1997 in violation of their lease with PPP; impairment of the Partnerships' contract rights relating to the leases by Lossett's secret addendums to the CCL, Rialto and HMBL leases).  While these and other injuries had the opportunity to be remedied or reduced in the future as the Caremark Action progressed, the fact remains that they were existing, actual injuries that were not going to arise at the resolution of litigation.  For example, the resolution of the Caremark Action would not determine whether Lossett breached his duty to the Partnerships.  Likewise, that litigation could not determine the consequences resulting from Lossett's breach of duty; the litigation's resolution was relevant to Lossett only insofar as it potentially affected the amount of damages the Partnerships might recover from Lossett.

[43]  See Memo p. 11-12 ("[I]f the harm occurred when the lease addenda were created, then the 'discovery rule' comes into play…it may be argued that the harm occurred when the lease term was reduced and that the Partnerships were put on inquiry notice as of **July 26, 1997**—the date Lossett sent a memorandum to the Partnerships with a lease termination date the Partnerships knew to be false [2004 instead of the correct date of 2009]."  (emphasis added).  While disputed by the Partnerships, Arter contends that the documents supporting the correct lease termination date of 2009 were at all times in the Partnerships' files and thus, not concealed from the Partnerships; thus, the Partnerships had no reason not to know of the true lease termination date.  Arter further suggests that this argument is likely buttressed by the fact that Dr. Groves was "very involved" and "customarily paid a great deal of attention to detail.") (*Id.* at p. 12.)

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 23

(2) CCL Lease Addendum (prior to June 8, 1998);[44] (3) a third possible date of damage accrual relating to the CCL Addendum 1 and Lease Addendum (beginning of 1999);[45] and (4) the HMBL (beginning of 1998).[46]

Arter concludes the Memo by stating that "because [of the] multiple interpretations of the pertinent documents and circumstances of 'discovery' are plausible, it is nearly impossible to predict with any degree of certainty what ultimate conclusion may be reached by a finder of facts."  Yet, in the very next sentence, arguing that if damage is found to have been accrued, Arter assigns unsupported probabilities: a 40% probability that the causes of action against Lossett regarding the CCL would be deemed to have accrued prior to June 8, 1998 and a 60% probability that a finder of fact would conclude that the causes of action accrued in early 1999.[47] Although these probabilities are stated without any analytical support, what is crucial is that the firm's attorneys acknowledged the obvious risk which should have spurred Arter into action (at a

---

[44]    See, the Memo, p.12 ("[T]he last date that the finder of fact is likely to determine that a cause of action accrued is **prior to June 8, 1998**—the date Roberts sent a memo to Groves identifying the discrepancies in the leases, addendums and loan agreements.")  (emphasis added).  Arter goes on to state in the Memo that "the evidence would ultimately show that Roberts conducted the analysis of the lease terms based on communications he had received from MedPartners at a date earlier than June 8, 1998," hence, the "prior to" June 8, 1998 language).

[45]    Arter makes even a third alternative argument regarding both of the CCL addenda by postulating that the damages could have accrued but were tolled for a short period of time.  See, the Memo, p.12-13, ("[O]n the other hand, a very compelling argument could be made that Lossett's communications after November 1995…concealed, his alleged wrongdoing regarding the addenda to the leases.  Accordingly,…the causes of action would not have accrued until [Roberts] determination of wrongdoing in the **beginning of 1999**…It was not until [Roberts] conducted his analysis in 1999, which was due to 'other circumstances' that the partnership realized that there had been any wrongdoing…It was not until further analysis of the issue was made at the beginning of 1999, that the impropriety of the creation of the Lease Addendum was recognized for what it was.").  (emphasis added).  Arter cites to the *Sherman, Hobart, Loynes* and *Alliance Mortgage Co.,* cases as support for this analysis.

[46]    The Partnerships claimed they knew nothing about Lossett's HMBL tampering until 1999, when Roberts and Stream discovered the HMBL lender file containing such secreted information—which was then immediately provided to Arter.  Here, despite this fact, Arter inexplicably concludes in its Memo on page 14 that, "the Addendum creating reduction in term of the [HMBL] was not secreted from the [P]artnership files."  Moreover, Arter concludes that the August 5, 1998 letter from Lossett was not likely enough to compel inquiry notice based on *Mortimer* Court's usage of passage of time as a factor to create inquiry notice—here, six (6) years had passed between this letter and date the lease was entered into in 1992 (Note: for some reason Arter's arithmetic calculates this six (6) year passage of time (from 1992 to 1998) as being a total of nine (9) years).  Finally, Arter concludes that regarding the HMBL, the "probability is that Roberts' analysis in the **beginning of 1999** would be the date which the cause of action against Lossett is deemed to have accrued."  (See, the Memo, p. 14 (emphasis added).)

[47]    There is no mention of the July 1997 date that Arter calculated as a possible accrual date.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 24

minimum to disclose the risk to the client, but also to take immediate steps to stop the running of the clock, either by tolling agreement or filing suit). The Memo clearly expresses Arter's concern that statue of limitations issues may exist, yet Arter failed to act, disclose or advise.[48]

Diligent research into then-existing case law should have taken into account case law involving malpractice and breach of fiduciary duty claims against professionals[49] causing various kinds of pecuniary loss or loss of legal rights. Legal malpractice cases would have been fertile ground for research, including those decided before and after the enactment of *Code of Civil Procedure* Section 340.6. Prior to 1978, there was no specific statute of limitations governing claims against lawyers and the Courts used *Code of Civil Procedure* Section 339 (two year statute of limitations that to this day still governs claims against accountants). Prior to Section 340.6 there was the seminal case of *Budd v. Nixen, supra,* 6 Cal.3d 195 (holding that the point in time when the client suffers appreciable harm is a question of fact in attorney malpractice cases).[50] Even

---

[48]  The undisclosed August 10 Memorandum came between two lulling written statements by Arter, the June 10, 2001 Sunkin e-mail and the December 11, 2001 Goldman memorandum to Roberts. Goldman's conclusion that it was too early to tell if the Partnerships had been harmed by Lossett misleading given the conclusions of the August 10 Memorandum which concluded there was a 40% chance that some claims were already time-barred. His suggestion that the claims could be asserted defensively, while true, was misleading without an analysis of whether the potential damages exceeded Lossett's claims.

[49]  Lossett's role was as **a manager**. While the claims against him were not for negligence, I consider these cases to be relevant.

[50]  The Supreme Court's treatment of this issue since *Budd* has continued to reinforce this holding. (See, e.g., *Jordache Enterprises, Inc. v. Brobeck. Phleger & Harrison, supra,* 18 Cal.4th at p. 754 (enunciating the "ultimate futility, of attempting to formulate categorical rules to determine actual injury for broad classes of legal malpractice claims" and concluding that "obstacles preclude any attempt to create a general rule that tolls the statue of limitations period until a related lawsuit establishes a causal connection" between a fiduciary's error and resulting injury); *Adams v. Paul, supra,* 11 Cal.4th at 591, fn. 4 (holding that there are no short cut "bright line" rules for determining actual injury under Section 340.6).) These three (3) California Supreme Court cases clearly articulate the intense factual nature surrounding the question of actual injury in cases similar to the one Arter was researching. It is indisputable that these three (3) cases represent the governing law of California and the most recent pronouncements of the State's highest Court and were readily ascertainable by diligent legal research on the part of Arter. When an attorney cannot find authority case directly on point with the issue they are researching (and Arter appears to have been in that situation based upon the documents I have reviewed), an intelligent and reasonable next step for any attorney researching such an issue is to research analogous case law. Here, it would have been reasonable, nay expected, that Arter would have investigated cases of breach of fiduciary duty and attorney malpractice in investigating the Partnerships' claims against Lossett (a fiduciary). Had Arter's research been more than cursory, Arter would have stumbled across them. Analysis of the documents received makes it painfully clear that, not only were these three (3) seminal cases not relied upon or discussed, they were never even discovered by Arter in its research. Had Arter conducted a modicum of research it would have been informed enough to know that the conclusion it reached (that of having the Partnerships "wait out" the conclusion of the Caremark Action before

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 25

pursuing other related claims) was fallacious and that it had counseled the Partnerships to ignore a ticking time-bomb.  Arter unnecessarily gambled with the Partnerships rights—and lost.

One example of an analogous case Arter could have researched is *Van Dyke v. Dunker & Aced* (1996) 46 Cal.App. 4th 446.  In *Van Dyke*, the Court discusses "actual injury" in the context of accounting malpractice under *Code of Civil Procedure* Section 339(1) in an attempt to determine the irremediable "point of no return."  (*See*, footnote 48, *ante*).

First, the *Van Dyke* case cites to *Foxborough v. Van Att, supra,* 26 Cal.App.4[th] at 227, a case in which a client hired an attorney to secure automatic development rights for property the client had purchased.  Due to the attorneys' negligence, the rights expired.  The Court found that actual injury occurred when the automatic development rights expired, stating, "when malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred.  (*Id.*)  This is analogous to our present case; when the Partnerships lost their rights to pursue Lossett due to the expiration of various statutes of limitation (via Arter's professional negligence), they incurred an actual injury notwithstanding any potential resolution of their damages in the future.  The fact remained that they had been injured.

Second, the *Van Dyke* Court cites to *Int'l Engine Parts, Inc. v. Feddersen & Co.* (1995)  9 Cal.4th 606 in which the Court addressed the issue when "actual injury," caused by an accountant's negligent filing of tax returns, occurred so as to commence the running of the two-year statute of limitations period of *Code of Civil Procedure* Section 339(1).  While the plaintiff argued that the statute of limitations for accountant malpractice should be tolled until all appellate review had been exhausted and the result of the adverse underlying judgment was "irremediable," the Supreme Court held that the applicable statute of limitations commenced when the plaintiff had knowledge of the "fact" of damage, i.e., when the underlying action was dismissed as a result of the attorney's negligence, and not, as plaintiff argued, on finality of a subsequent appeal.  (*citing Laird v. Blacker* (1992) 2 Cal.4[th] 606, 615.)  In *Fedderson,* the following chronology took place: (1) the accountant negligently omitted certain financial information from the client's 1983 and 1984 tax returns; (2) the returns were audited; (3) the client learned in 1986 that it would lose its favorable tax status and that its tax liability could approximate $300,000; (4) the client's line of credit was reduced by $200,000; (5) the client had to withdraw a settlement offer in unrelated litigation; (6) the client paid attorney fees for representation during the audit process; and (7) the audit became final as to the IRS when it assessed a deficiency and imposed penalties and interest on May 16, 1988.  The Court concluded that that actual injury coincided with the tax deficiency assessment.  The Court observed that whether the client suffered actual injury from a negligently prepared tax return was contingent on the outcome of the audit.  The Court reasoned that once the audit process terminated adversely to the client and resulted in a deficiency assessment, the harm from the alleged negligence was no longer contingent, and the cause of action accrued.  (*Id.* at 620)  In the present action, there was nothing contingent relating to Arter's negligence; rather, once the statutes of limitation had run, nothing conditional remained.  Indeed, reading this case would have given Arter pause to conclude that the Partnerships' statutes of limitation were being tolled until other proceedings made various determinations.  While no underlying case was dismissed in the present action, this case still supports the conclusion that the Partnerships' statutes of limitation were running as soon as they were damaged.

# PARKER SHUMAKER MILLS LLP
## THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 26

after the enactment of Section 340.6, there were wildly divergent cases dealing with when "actual injury" occurs, with even the California Supreme Court confused and vacillating.[51]  For whatever reason, Arter's research does not seem to have considered this body of case law, casting further doubt on its reasonable and diligent research into this issue.

If Arter done diligent research (commensurate with the magnitude of the stakes), it would have known enough to be uncomfortable about any decision to delay the way they did in this instance. Ultimately, Arter's own analysis of these cases that it **did** review created enough uncertainty to cause them to believe that a risk that the claims were or would soon be time barred **may** exist—so much so that they assigned percentage calculations to the various dates the statutes likely began to run.  Therefore, it is perplexing as to how they came to their ultimate conclusion to wait for the outcome of the Caremark Action and not protect the Partnerships (or even provide this information to the Partnerships in response to the Partnerships continuing requests on this topic) when the majority of the Memo supports the conclusion that causes of action and damages had already accrued against Lossett as of the date of the Memo.

---

[51]  In *Jordache*, the Supreme Court held that the legal expense of hiring counsel to attempt to mitigate the threatened harm constituted actual injury sufficient to trigger the statute of limitations, even though it still was not certain if the client's legal rights were irreparably compromised (by the defendant attorneys' failure to timely tender the client's defense to its insurer in business litigation).  In so ruling, the Supreme Court reversed course and repudiated its decision in *ITT Small Business Finance Corp. v. Niles* (1994) 9 Cal.4th 245, rendered only four (4) years earlier.

The *Jordache* Court engages in over ten (10) pages of "hand-wringing" over its uncertainty in this area by attempting to reconcile *Budd*, Section 340.6 and subsequent case law.  Ultimately, the Court holds that , "[t]he 'actual injury' provision in [*Code of Civil Procedure*] section 340.6, subdivision (a)(1), effectively continues the accrual rule *Budd* established…The test for actual injury under section 340.6, therefore, is whether the plaintiff has sustained any damages compensable in an action.  This interpretation is consistent with the plain language of the statute and the Legislature's manifest intent in enacting section 340.6.  The lead and concurring opinions in *Adams* emphasized, determining when actual injury occurred is predominantly a factual inquiry.  (*Adams v. Paul, supra,* 11 Cal.4th at p. 588 (lead opn. of Arabian, J.); *Id.* at p. 595 (conc. opn. of Kennard, J.)" (*Jordache Enterprises, Inc. v. Brobeck. Phleger & Harrison, supra,* 18 Cal.4th at p. 751.)  As part of the progeny of *Budd,* the *Adams* Court found, "nothing in the language or history of [CCP] section 340.6(a)(1) indicating the Legislature intended, in codifying decisional law, to alter the well-settled principle that in legal malpractice actions statute of limitations issues, including injury, are at base factual inquiries.  That established standard is reiterated or alluded to at least four times in *Budd v. Nixen, supra, 6* Cal.3d at 198, 202, 203-04, from which the 'actual injury' tolling provision of the statute derives.  (*Laird v. Blacker* (1992) 2 Cal.4th 606, 612.)  Had the Legislature meant to significantly modify the law, it surely would have made that intention explicit."  (*Adams v. Paul, supra,* at p. 588.)

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 27

In reiterating a 1992 Court of Appeals decision, Jordache[52] held that actual injury is sustained when attorneys' fees are incurred. (*Jordache Enterprises, Inc. v. Brobeck. Phleger & Harrison*, supra, 18 Cal.4[th] at p. 759 (citing *Sirott v. Latts (*1992) 6 Cal.App.4[th] 923, 928-29) (emphasis added).) Thus, incurring of attorneys' fees is enough to trigger the running of statutes of limitation where the later hired attorney's services are designed to avoid or mitigate harm caused by the tortfeasor inasmuch as such expenses are mitigational in nature and represent recoverable consequential damages under the Doctrine of "Tort of Another." In Sirott,[53] the Court found (under Budd's rationale) that a doctor sustained actual injury for purposes of Section 340.6 when he incurred costs to defend a medical malpractice action. Similarly, the Jordache[54] Court found that Jordache had incurred attorneys' fees because its attorneys' alleged errors caused it to forgo a primary benefit. The Jordache Court found that the fiduciary's "neglect required Jordache to pay…costs in the [separate] action for years and to lose investment opportunities for those funds" and that the fiduciary's actions "gave the insurers an objectively viable defense." (*Jordache Enterprises, Inc. v. Brobeck. Phleger & Harrison*, supra, at 761.) Applying the same rationale to the present issue, I see that there is an alarmingly similar (if not even a more damaging) fact pattern. Here, Lossett's active fraud far surpasses the mere neglect alleged against the attorneys in Jordache. Further, it appears to me that Lossett's malfeasance required the Partnerships to pay attorneys' fees and costs to Arter for years relating to the Partnerships' prosecution and defenses of various claims, including but not limited to the Caremark Action. The incurring of the obligation of these costs and fees (not to mention the actual payment of

---

[52] *Jordache* should now be a case with which Arter is quite familiar as it is cited approximately a half dozen times in a recent published case in which Arter was sued for malpractice—*Beal Bank, SSB v. Arter & Haden, LLP* (September 27, 2007) 42 Cal.4[th] 503.

[53] In *Sirott,* the defendant attorneys advised a retiring doctor that he need not pay the required $50,000 premium for his medical malpractice insurer's "tail" coverage after his retirement. The attorneys told the doctor that the premium was unconstitutional and an unenforceable form of age discrimination. The doctor was sued later for medical malpractice. He had to use his own funds to retain defense counsel and to settle the suit. A few weeks after settling, the doctor sued the attorneys, with the Court ultimately finding that the doctor sustained actual injury when he incurred attorneys' fees to defend the medical malpractice suit. (*Sirott v. Latts, supra,* 6 Cal.App.4[th] at p. 923.) Moreover, given that this was the law in California as of 1992, there is no excuse for Arter not reviewing or even finding these cases in its later investigation.

[54] In *Jordache,* the clients asserted that attorneys were negligent in defending them by failing to advise them concerning, or to assert on their behalf, entitlement to liability insurance benefits covering the suit. They argued that their malpractice claim did not accrue until their suit against the insurer was settled. The Court rejected that argument, concluding that the clients' claim accrued much earlier when they incurred damages— both in the form of "unpaid insurance benefits for defense costs in the [third party] action and in lost profits from the diversion of investment funds to pay these defense costs." (*Jordache Enterprises, Inc. v. Brobeck. Phleger & Harrison, supra,* 18 Cal.4[th] at 752.)

# PARKER SHUMAKER MILLS LLP
THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 28

same) caused the Partnerships to lose investment opportunities for said funds in the exact same manner in which Jordache was deprived of its own investment opportunities.

Arter was hired by the Partnerships to remedy the problems that Lossett (a fiduciary to the Partnerships) had previously created.  Under *Jordache*, therefore, the moment the Partnerships hired Arter to deal with those problems,[55] actual injury accrued in the form of attorneys' fees incurred by the Partnerships and the statutes of limitation began to run.  The supreme irony of Arter's conclusion that the Partnerships' damages did not exist at the time of the Memo, is that the damages came into existence when the Partnerships incurred an obligation to Arter. *In short, the damages that Arter could not find were created by Arter's own attorneys' fees.*

Beyond ignoring the high likelihood of a finding of actual injury as a result the Partnerships' having to hire Arter to deal with the problems caused by Lossett, Arter also failed uncover other damages the Partnerships had already accrued.  Had Arter performed adequate and diligent research, it would have discovered that California case law clearly establishes that actual injury (damages) can take on various forms.  Indeed, **any** actual injury flowing from a fiduciary's negligent conduct is enough to trigger the running of a statute of limitations; the greatest part of the damages need not have yet accrued.[56]  Cases following *Budd* and *Davies*, such as *Adams*, hold that, "In the 'classic' missed statute situation, in **which the attorney negligently fails to file the underlying lawsuit within the applicable statutory period and does nothing further, the plaintiff suffers actual harm at the time the statutory period lapses** because, assuming the claim was otherwise viable, the right and/or remedy of recovery on the action has been substantially impaired."[57]  With *Adams*, the Court recognized that damages may consist of any impairment or diminution, as well as the total loss or extinction, of a right or remedy.[58]  Here, and as further

---

[55]  Which, at least according to Goldman's testimony, appears to be in late 1997 or early 1998.  In December 1997, Arter was hired to be the Partnerships' counsel to "handle routine business matters of the Partnerships."  Shortly thereafter, on January 6, 1998, Roberts and the Partnerships began actively seeking Arter's counsel regarding their discovery that Lossett had failed to obtain any assignments/assumptions/guarantees associated with the MedPartners leases.  According to Goldman's own deposition testimony, by 1998, Goldman was having communications with Lossett's legal counsel warning of claims the Partnerships would pursue against Lossett for mismanagement and malfeasance.  According to Goldman, the damages caused by Lossett's mismanagement and malfeasance were "the unresolved dispute with Caremark over the leases and the [legal] expense that was being incurred by the partnerships as a result of that."  (Goldman Deposition at 72:4-18.)

[56]  "The cause of action arises, however, before the client sustains all, or even the greater part, of the damages occasioned by [the] attorney's negligence.  Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action upon which the client may sue."  (*Budd v. Nixen, supra,* 6 Cal.3d at p. 201.)

[57]  *Adams v. Paul, supra,* 11 Cal.4th at p. 589 (emphasis added).

[58]  *Id.* at p. 589-91 (lead opn. of Arabian, J.); *Id.* at 597 (conc. opn. of Kennard, J.).

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 29

outlined in the following paragraph, it appears clear that the Partnerships had suffered damages long before Arter began researching the statute of limitations issue. While the **amount** of damages was subject to potential variation, nothing exists to change the ***fact*** that the Partnerships suffered losses directly attributable to Arter's negligence.

"[W]hen malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred." (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison, supra,* 18 Cal.4[th] at p. 751 (citing 2 Mallen & Smith, *Legal Malpractice* (4th ed. 1996) Statutes of Limitations, § 21.11, at 782).) Here, despite Arter's conclusion to the contrary, the Partnerships had accrued damages: their contract rights relating to the leases were impaired by Lossett's secret addendums to the CCL and HMBL leases; the Partnerships had lost the value of their security in the leases which were relied upon by the Partnerships and the lenders and understood by all as extending well into the 21st century; on April 1, 1997, MedPartners quit paying rent[59] and vacated the premises, notwithstanding a binding lease term; even though the lenders had yet to take action at the time the Memo was drafted, the Partnerships had still incurred an obligation to their detriment by losing the security of the leases to cover the loans associated with the CCL and HMBL property; while not having reviewed the lenders' documents, it is a fair to assume that the Partnerships were in breach of their contracts with the lenders due to Lossett's secret addendums that pulled the security of the long-term leases directly out from under both the lenders and the Partnerships thus, imposing a liability on the Partnerships. "Any appreciable and actual harm flowing from the attorney's negligent conduct establishes a cause of action upon which the client may sue." (*Jordache Enterprises, Inc., supra,* at p. 750 (*quoting Budd v. Nixen, supra,* 6 Cal.3d 195, 201).)

Had any of these cases been uncovered in Arter's research, Arter would have realized that this is an area of the law fraught with uncertainty. The *Jordache* Court held that, "[t]he question here presented is not a new one. The concept of 'actual injury' has proved troublesome to the bench and bar, resulting in numerous appellate opinions in recent years which attempt to distill the meaning of the term, and to apply the 'actual injury' tolling provision to the facts of the particular cases. As a consequence of the continued confusion and uncertainty surrounding the actual injury tolling provision, injured clients do not know when to file their attorney malpractice lawsuits, and the lawsuits in turn are resolved not on the merits but on the issue of timeliness." (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison, supra,* 18 Cal.4[th] at p. 739.)

In *Davies v. Krasna* (1975) 14 Cal.3d 502, 514, the California Supreme Court held that, "the infliction of appreciable and actual harm, however uncertain in amount, will commence the

---

[59]   Later assigned the leases to others who quit paying rent in January 2001. Counterclaim ¶ 103-04.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 30

statutory period.  Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations."  As of 2001[60] (and continuing to today), the Court has continued to employ the rationale of *Davies* in determining the accrual of a cause of action by determining when actual injury is suffered.  The touchstone for the analysis continues to remain the fact that California Courts have yet to expressly define the phrase "actual and appreciable harm."  While the Courts continue to lean on *Davies* they also continue to struggle in its application[61] as they recognize the amorphous nature of the language contained in it.  As such, plaintiffs continue to face a conundrum: they cannot bring a case too soon if the damages are not "actual and appreciable" since such a case would not yet be ripe.  Yet, on the other hand, if a plaintiff delays bringing suit, they run the risk of having the statute of limitations run on them.

Most of the California decisions since *Davies* have interpreted "actual and appreciable harm" as synonymous with "actionable" or "compensable" harm.  For example, in *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, the Court cited *Davies* for the proposition that "the statute of limitations begins to run upon the occurrence of 'appreciable and actual harm, however uncertain in amount,' that consists of more than nominal damages." (*Id.* at p. 582 (quoting *Davies v. Krasna, supra,* 14 Cal.3d at p. 514).)[62]  Since any compensable injury will, by definition, give rise to damages that are more than nominal,[63] then any compensable injury, however slight, would be "actual and appreciable harm" that would commence the statutory period.[64]  The decision in *Priola v. Paulino* (1977) 72 Cal.App.3d 380, illustrates how California Courts have interpreted *Davies* as reaffirming the traditional rule.[65]  In *Priola,* a husband sued for the loss of

---

[60]  The date of Arter's Memo.

[61]  Again, yet another reason Arter should have erred on the side of caution.

[62]  *See also, Evans v. Eckelman* (1990) 216 Cal.App.3d 1609, 1620 ("[T]he cause of action is complete on the sustaining of 'actual and appreciable harm,' on which the recoverable damages would be more than nominal.") (*quoting Davies v. Krasna, supra,* 14 Cal.3d at p. 514); *Van Dyke v. Dunker & Aced., supra,* 46 Cal.App.4th at p. 452-53.

[63]  Nominal damages are awarded "for the infraction of a legal right, where the extent of loss is not shown, or where the right is one not dependent upon loss or damage." (C. McCormick, Damages, sec. 20 at p. 85 (1935).)  Nominal damages are contrasted with small compensatory damages "which are measured by the loss actually suffered."  (*Id,* sec. 21 at p. 87).

[64]  *See also, Garver v. Brace* (1996) 47 Cal.App.4th 995, 1000 ("Any 'manifest and palpable' injury will commence the statutory period.")  (quoting *Adams v. Paul, supra,* 11 Cal.4th at p. 589); *Marsha V. v. Gardner* (1990) 230 Cal.App.3d 663.

[65]  The traditional rule in California was that the limitations period begins to run as soon as the plaintiff suffers any compensable injury, however slight.  "[W]here an injury, although slight, is sustained in consequence of the

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 31

his wife's consortium approximately two (2) years after she was injured in an auto accident.  (*Id.* at p. 380.)  He argued that his claim was not time-barred because, although his wife did suffer less serious injuries at the time of the accident, he did not lose her services until she developed Parkinson's disease more than a year later.  The Court, however, reasoned that the statute of limitations attached as soon as the husband had a cause of action and that his cause of action was complete when his wife suffered her initial injuries because these reduced his wife's consortium "to some extent."  (*Id.* at p. 391.)[66]  The fact that more grievous injuries arose later did not affect the analysis.  (*Id.*)  In support of its conclusion, the *Priola* Court cited both *Davies* and *Sonbergh.* Clearly, in the *Priola* Court's view, *Davies* had simply reaffirmed the traditional rule expressed in *Sonbergh.*

However, in contrast to this, a few cases since *Davies* have suggested that the actual and appreciable harm test requires something more than a showing of any compensable harm, however slight; a "compensable harm plus" standard.  These cases interpret "nominal damages" to include not just damages that are nominal in a technical legal sense, but also compensatory damages that are so small that it would be unreasonable to sue for them.  In contrast, "actual and appreciable harm" would be injury significant enough to justify bringing a lawsuit.  These cases thus view *Davies* as a departure from or modification of the traditional rule.  The first case to adopt this interpretation of *Davies* was *DeRose v. Carswell* (1987) 196 Cal.App.3d 1011.[67]  The *DeRose* Court added, "[w]e do not believe that the court in *Davies* can reasonably be interpreted as having used the term 'nominal' in the restrictive sense of 'one dollar.'"  (*Id.* at p. 1025.)  It then went on to apply its understanding of *Davies* to an earlier related case.  It concluded that the case was wrongly decided because it held that the limitations period began to run when the plaintiff

---

wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once.  It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date."  (*Sonbergh v. MacQuarrie* (1952) 112 Cal.App.3d 771, 774.)

[66]  *Accord Uram v. Abex Corp.* (1990) 217 Cal.App.3d 1425, 1438 (holding that wife's cause of action for loss of her husband's consortium arose when he retired due to a work-related disability and her consortium "was to some extent reduced.")

[67]  The primary issue in *DeRose* was whether delayed discovery of injury and its causal relation to sexual abuse should toll the statute of limitations.  In *DeRose,* an adult plaintiff filed suit against her step-grandfather seeking damages arising out of sexual abuse inflicted on her during her minority.  The complaint asserted causes of action for assault, battery, and negligent and intentional infliction of emotional distress.  Plaintiff DeRose alleged that when she was between the ages of four and eleven defendant Carswell committed acts of sexual abuse "against [her] will and without [her] consent."  She alleged that she did not immediately discover the injuries and their cause" due to the nature of the acts of the defendant, and the psychological mechanisms experienced by [her] to deny, repress and dissociate herself from the underlying events, or to seek therapeutic intervention until within the last six months."  (*DeRose, supra,* at p. 1015.)

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 32

first suffered a compensable injury, even though there was no indication that the injury was significant enough to justify a lawsuit.  (*Id.* at p. 1025 n. 7 (criticizing *Martinez-Ferrer v. Richardson-Merrel, Inc.* (1980) 105 Cal.App.3d 316).)  Although the *DeRose* Court did not explicitly say so, its reasoning suggests that it interpreted *Davies'* use of the term "nominal" in the broader sense of "too insignificant to justify a lawsuit."  Ultimately, the *DeRose* Court found that the plaintiff *had* suffered injuries significant enough to justify legal action more than a year before she filed.[68]  Thus, even if *Martinez-Ferrer* had been decided under a liberal interpretation of *Davies,* the holding in *DeRose* would have been the same.  Because the *DeRose* plaintiff's earlier injuries were significant, the statute of limitations had run under either interpretation of *Davies.*  Hence, *DeRose* 's more liberal interpretation of *Davies* did not affect the result.

This well-established split in the application of the ambiguity of *Davies* would have placed an attorney with reasonable research skills on notice that the Partnerships were in a similar circumstance; they did not want to file if their claim was not ripe, yet (and more importantly) they did not want the statutes of limitation to run out from under them.  As discussed earlier, it appears clear that the Partnerships had suffered "actual and appreciable harm" at numerous turns well before Arter's Memo.   In the present case, regardless of the lens employed (either *Priola* or *DeRose*), it would appear that the Partnerships had accrued causes of action by suffering compensable damages that were more than just nominal such that waiting to commence the Partnerships rights was inexcusable.

As the Memo strongly suggests, Arter was not convinced that waiting to bring claims against Lossett was the professionally responsible thing to do.[69]  And, indeed, Arter had good reason for

---

[68]   The Court reasoned that "the conduct, which purportedly resulted in the adult being under the grandparent's dominance, had ceased during the adult's minority, and she had the benefit of the full limitations period; nevertheless, she delayed for over four years in filing suit.  Also, that conduct could not have affected her ability to appreciate the causal relationship between the alleged assaults and her subsequent emotional injuries, since she had been aware of the assaults when they occurred and had perceived them as offensive quite apart from her subsequent emotional problems."  (*DeRose* at p. 1027.)

[69]   Here again, a modicum of research would have revealed that waiting for such a judicial determination was the direct contrast with established California law.  The *Adams* Court held that conditioning a finding of harm on such a consideration would conflict with the rationale of *Laird v. Blacker, supra,* 2 Cal.4th 606, in that it tends to resurrect the rejected notion of "irremediability" as the focus of actual injury.  ("Consistent with the rule and rationale I articulate, it is important to note that in these latter situations of contingent or speculative harm, the determination of actual injury does not necessarily depend upon or require some form of final adjudication, as by judgment or settlement.  '[A]n injury does not disappear or become suspended because a more final adjudication of the result is sought.'"  (*Adams v. Paul, supra,* 11 Cal.4th at p. 599-600 (*citing, Laird v. Blacker, supra,* 2 Cal.4th at p. 615).)

Regarding the concept of "irremediability": For purposes of tolling statutes of limitation for attorney malpractice until plaintiff has sustained actual injury, "actual and appreciable harm" exists when harm becomes

# Parker Shumaker Mills LLP
### The Lawyers' Lawyers

Robert M. Gilchrest, Esq.
November 30, 2009
Page 33

such uneasiness.  Arter's conclusions of "maybe there are no damages" was self-evidently speculative; not exactly a sound basis for protecting a client's rights.  At best, Arter seems to have adopted a strategy of awaiting resolution of the Caremark Action and a clear determination as to the magnitude of the damages before addressing whether to bring an action against Lossett.[70]  At worst, Arter knew it had been dilatory by failing to act on various statutes of limitation running against the Partnerships and Arter was merely waiting for Lossett to file suit so that Arter could assert the Partnerships' claims defensively.[71]

After Arter completed the Memo, it (inexplicably) decided not to share it or its contents with the Partnerships (who had been repeatedly inquiring into their rights against Lossett for several years).  Instead, Arter merely reiterated its mantra to the Partnerships that they should not worry and that they will deal with Lossett after the Caremark Action was completed.

---

"irremediable," which means impossible to remedy.  (*Turley v. Wooldridge* (1991) 230 Cal.App.3d 586).  *Code of Civil Procedure* Section 340.6 commences to run when the limitations period for an underlying cause of action expires.  The *Laird* case specifically repudiated cases holding that damage must be "irremediable" before it becomes "actual injury" within the meaning of *Code of Civil Procedure* Section 340.6.  "Thus plaintiff's attempt to 'remedy' some of the harm by filing a third party action . . . did not delay accrual of the statute of limitations.  Once plaintiff's right was lost, he was damaged even though the amount of his damages had not yet been ascertained."  (*Finlayson v. Sanbrook* (1992) 10 Cal.App.4th 1436, 1443); *See also*, Witkin, Cal. Proc. (4[th]ed.) § 589; In "missed statute case" involving attorney malpractice, which is case in which alleged malpractice is attorney's failure to file suit within applicable statute of limitations, actual injury occurs when statute of limitations expires for underlying action.  (*Gailing v. Rose, Klein & Marias* (1996) 43 Cal.App.4th 1570.)

[70]  From an August 24, 2001 Arter teleconference memoranda: "[Goldman] has been wanting to wait until we actually have damages [following the Caremark Action]."  Further, Arter's April 11, 2002 teleconference notes indicate that there was no advantage to file a complaint against Lossett at that time and that it did "not prejudice partnerships rights of future claims against [Lossett] based upon actual damages, when determined.  Have tolling of statute of limitations in effect, now; can get claims for indemnity after Caremark damages determined."  Further, this document indicated that Arter assured the Partnerships that as of April 11, 2002, "we have no statute of limitations problems."  According to Sunkin, he was taken off the case in April 2002.  Sunkin deposition p. 143.

[71]  In December 2001, Arter corresponded with the Partnerships by stating, "In any event, we [Arter and the Partnerships] discussed that any Partnership that would otherwise be barred by statute of limitations considerations from asserting claims against [Lossett] [no specifics are given beyond this generalized statement], could withhold distributions from [Lossett] by asserting a "charge" against Ron's interest as a partner.  In the event [Lossett] would institute legal action to compel distributions, then those Partnerships could assert their claims against [Lossett], because they would no longer be time-barred by the statute of limitations for defense purposes."  See Sunkin deposition p. 115 re February 2002 discussions with client.  Client indicated discovery in 2000.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 34

Finally, in December 2001[72], after repeated requests by the Partnerships, Arter relented and sent a ***redacted*** version of the Memo to the Partnerships.  Significantly, in a letter accompanying the Memo to the Partnerships, Arter refers the Partnerships to various telephone conversations and prior correspondence regarding discussions of Lossett's liability that Arter knew were nonexistent.[73]  This conduct was inconsistent with the attorneys' ethical duty to disclose to the client when the attorney's own negligent conduct has caused the client harm.  *Beal Bank v. Arter & Hadden* (2007) 42 Cal.4th 503 ("attorneys have a fiduciary obligation to disclose material facts to their clients, an obligation that includes disclosure of acts of malpractice.").

**Conclusion**: There is never any reason to gamble with a potential statute of limitation issue—especially one of which an attorney is aware and chooses to actively ignore.  In my judgment Arter was negligent in its delay, analysis and advice with the result that the law firm's conduct created a substantial statute of limitations defense in favor of Lossett.  The 14-page research memorandum compiled by Arter[74] even concluded on page 10 that "there is a ***possibility*** that a determination would be made that the causes of action against Lossett have not yet accrued." (Emphasis added.)  However, the same memorandum discusses the plausibility of a determination that the causes of action likely accrued against Lossett in 1999 (or perhaps even earlier)!  The mere fact that Arter's own memorandum concedes the possibility that the Partnerships have accrued causes of action against Lossett and that the clock is ticking, provides more than ample evidence to support the duty of care Arter owed to the Partnerships (and the breach thereof by not taking *any* action on behalf of the Partnerships).  By not protecting its client's rights through the multitude of any avenues available to them, Arter created a statutory defense for Lossett.  It appears that Arter was liable for negligence/malpractice when it failed to prevent the relevant statutes of limitation from running—enabling Lossett to escape any liability to the Partnerships and forcing the Partnerships to settle this matter to their severe detriment. It also appears that the law firm breached its duty to disclose the resulting problems to the clients.

---

[72]  This is the same month Roberts wrote his December 5, 2001 memorandum asking for advice on whether to currently pursue a cross-complaint against Lossett. Goldman replied December 11, 2001.

[73]  A portion of that correspondence read, "until the outcome of the Caremark litigation, we do not know for certain whether, or to what extent, the Partnerships will have monetary claims against [Lossett]…to the extent that any of the Partnerships are negatively impacted by [Lossett's] conduct, after a trial in the Caremark litigation, those Partnerships will have a right of recourse against [Lossett], subject to the statute of limitations issues we discussed in a prior memorandum and conference call."  In his deposition, Goldman could not identify the "prior memorandum" or teleconference to which the memorandum refers.

[74]  The Partnerships were completely unaware of the August 10, 2001 Memorandum's existence.  Indeed, as stated above, it was not until December 2001 that the Partnerships were even sent a redacted version of this document.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 35

**3.  Issue #3**:     Analysis of the Court's April 28, 2006 ruling in favor of the Partnerships on
                        Lossett's demurrer on statute of limitations grounds.

After reviewing the Partnerships' Second Amended Cross-Complaint, Lossett's Demurrer to the
same, the Partnerships' Opposition to the Demurrer, Lossett's Reply brief in support of the
Demurrer, and the Court's April 28, 2006 ruling on the Demurrer, it appears that Judge Michael
Gunn's April 28, 2006 ruling in favor of the Partnerships (on statute of limitations grounds) on
Lossett's Demurrer does not materially affect the Partnerships' position against Arter.

      **a.**        **The Pleadings:**

The above identified documents reveal the following facts:  On February 24, 2006, the
Partnerships (and other third parties) filed their Second Amended Cross-Complaint and Third
Party Complaint ("SACC") for fourteen (14) separate causes of action including various
breaches of fiduciary duty, breaches of contract, constructive fraud and declaratory relief against
Lossett, the Lossett Family Trust and Pacific Investments.[75]  On March 30, 2006, Lossett filed a
demurrer to the SACC contending, among other things, that the Partnerships had artfully pleaded
around any statute of limitations defenses[76] that could be raised, but that prior pleadings (of
which the Court could take judicial notice) enabled Lossett to seek dismissal at the pleading
stage based on that defense.[77]  In relevant part, Lossett only specifically references the statute of
limitations defense in the first cause of action (breach of fiduciary duty relating to the PPSI
disputes) and the second cause of action (Lossett's constructive fraud).  Only by cursory
implication does Lossett reference the statute of limitations issue with respect to any of the other
causes of action addressed in the Demurrer.  Regarding the first cause of action (fiduciary duty),
Lossett claims that this is actually a fraud claim in disguise and thus, a three (3) year rather than
a four (4) year limitations period should apply.[78]  He further contends that if the three (3) year
period is applied from May 28, 2004,[79] anything prior to May 28, 2001 is barred as a matter of

---

[75]   Inasmuch as the SACC alleges that Lossett, the Lossett Family Trust and Pacific Investments were all the alter
        egos of one another, the specific factual allegations against Lossett applied with equal force to these other two
        entities. From this point forward, unless otherwise noted, any further references to Lossett individually will
        encompass both the Lossett Family Trust and Pacific Investments.

[76]   "Relying on 'artful pleading,' [Partnerships] have pled around a limitations defense."  (Demurrer, 1:4-6.)

[77]   "With the benefit of judicial notice of [other lawsuits initiated by the Partnerships], the missing pieces of the
        limitations defense are properly before the court."  (Demurrer, 1:7-9.)

[78]   Demurrer, 9:2-28.

[79]   This date is used by Lossett since Lossett's own complaint in this matter was filed on this date.  Lossett argues
        that the SACC should be forced to use this date from which to calculate the three (3) year statute of limitations.

# Parker Shumaker Mills llp
## The Lawyers' Lawyers

Robert M. Gilchrest, Esq.
November 30, 2009
Page 36

law.  With respect to the second cause of action (fraud), Lossett claims that the Partnerships first had knowledge of their fraud claims against Lossett for his failure to disclose the various improper lease amendments no later than April 4, 2001.[80]  And as such, the current cause of action against Lossett in the SACC was outside of the three (3) limitations cut-off date of May 28, 2001.  As will be seen below, Lossett's counsel made the strategic decision to stand on the (3) three year statute of limitations and offer no alternative argument that the pleaded allegations were still susceptible to the four (4) year statute of limitations.  Of course, they were constrained by the four corners of the pleading coupled with judicial notice, which was an artificial reality in the context of a pleading challenge.  I am not so constrained nor, as I also discuss below, could the Partnerships turn a blind eye to the shortcomings of the Lossett Demurrer.  The decision to settle was prudent because, even with the benefit of a four (4) year statute of limitations (which was far from assured as to each and every claim), there was ample evidence of both actual and imputed knowledge of the facts upon which the claims against Lossett were based and actual loss incurred by the Partnerships was more than four (4) years before the litigation was commenced.

In the Partnerships' April 17, 2006 Opposition to the Demurrer, they correctly argue that mere awareness of Lossett's wrongdoings is not enough to trigger a statute of limitations to begin running; damages are needed.  However, of minor concern is the fact that they posit that the Partnerships did not suffer any damages until the Caremark Action settled in 2002.[81]  However, as discussed *infra*, this should not affect the Partnerships' current position against Arter.  Finally, Lossett's April 20, 2006 Reply is really nothing more than an improper re-hash of the Demurrer itself.  The only additional argument of note relating to the statute of limitations issue is given cursory mention when Lossett opines that the Partnerships suffered damages prior to the Caremark Action's settlement.[82]

---

[80]   The date the Caremark Action was filed by the Partnerships (containing references to such information). The second cause of action contains a request for declaratory relief with respect to the issue of the lease term and whether it was validly shortened, as defendant contended. See, e.g., paragraph 56.

[81]   "Here the Partnerships did not suffer actual damages until their action against Caremark was settled in 2002." (Opposition, p. 1:  23-24.)  As discussed earlier in this letter, it is clear that, in the Caremark Action alone, the Partnerships likely suffered damages as early as 1998 when they had claims against Lossett based upon Lossett's mismanagement/malfeasance relating to the Partnerships.

[82]   "[Partnerships] argue that they did not suffer any damage whatsoever until 2002, when the settled the Caremark [Action].  In fact, they suffered two different types of damages before that.  The Caremark [Action] was filed in 2001, outside the limitations period…The lawsuit alleges that the Partnerships have incurred both legal fees and costs…The legal fees and costs incurred are damages recoverable against Lossett under the 'tort of another doctrine.'  The doctrine allows a plaintiff to recover attorney fees and damages against a defendant if he is required to employ counsel to prosecute or defend an action against a third party because of the tort of defendant. *Behniwal v. Mix* (2005) 133 Cal.App.4[th] 1027.  The [Partnerships] were in precisely this situation, as shown by the declaratory judgment cause of action in the Caremark [Action] in which the Partnerships were

# PARKER SHUMAKER MILLS LLP
#### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 37

     **b.**      **The Court's April 28, 2006 Ruling:**

The Court ultimately ruled that the Demurrer to the "first [breach of fiduciary duty re: PPSI disputes], second [constructive fraud], third [declaratory relief], fourth [breach of fiduciary duty re: Cape Cod partnership agreement], eighth [breach of fiduciary duty re: VMG partnership agreement], ninth [breach of fiduciary duty re: Fontana partnership agreement], tenth [breach of fiduciary duty re: Rialto partnership agreement], twelfth [breach of fiduciary duty re: Hesperia partnership agreement] causes of action are overruled.  These causes of action have been adequately alleged.  The demurrer to the fifth [breach of contract re: Cape Cod partnership agreement], seventh [breach of contract re: PPP partnership agreement], eleventh [breach of contract re: Rialto partnership agreement], and thirteenth [breach of contract re: Hesperia partnership agreement] causes of action are sustained with thirty (30) days leave to amend.  The Partnerships must allege additional contractual terms."[83]

Specifically, the Court's ruling made several references to statute of limitations issues raised in the Demurrer.  First, with respect to the first cause of action (breach of fiduciary duty), the Court noted that despite Lossett's argument to the contrary,[84] the statute of limitations for this breach of fiduciary duty cause of action is four (4) years; that the bar date "would be four years preceding [the complaint's filing date of May 28, 2004] or May 28, 2000.  There are no dates alleged in the complaint that would bar this cause of action."[85]  The Court continued, "[the Caremark Action] was commenced on April 4, 2001.  [Lossett] argued that [the Caremark Action establishes that the Partnerships knew of issues surrounding the lease no later than April 4, 2001, a date they contend was outside the three year statute of limitations they urged here.  However, it is the four year, not the three year, statute of limitations that is applicable here.  The second amended

---

forced to litigate the effect of lease amendments they now claim Lossett wrongfully executed…. Second, the shortcoming of commercial leases by five years and fifteen years resulted in an immediate loss of value in each of the properties: *a multimillion dollar income stream disappeared*.  These damage [sic] was sufficiently 'actual' that [Partnerships] were legally entitled to sue the tenant to recover them, even though the tenant remained in possession." (emphasis in original; footnote excluded.)

[83]    April 28, 2006 Ruling of the Court Concerning Demurrer to All Causes of Action of Cross-Complaint; Except to the Sixth Cause of Action ("Ruling") p. 12:18-22.)  Note, that despite the Court's express overruling, sustaining with leave to amend and exclusion of the various causes of action in the SACC, there is never any mention as to the fourteenth cause of action (breach of fiduciary duty re: Aspen partnership agreement.)

[84]    Namely, that this cause of action is actually a fraud cause of action in disguise and thus, a three (3) year statute of limitations is the applicable time limit.

[85]    Ruling, p. 4: 26-28.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 38

complaint itself alleges that the Partnerships did not know of the existence of the Rialto lease addendum until September 2002; that breach is clearly within the limitations period."[86]

Regarding the second cause of action (constructive fraud), the Court ruled as follows: "With respect to the statute of limitations, the statute of limitations is three years for constructive fraud. *Agair, Inc. v. Shaeffer* (1965) 232 Cal.App.2d 513, 517-19.  In this case, the April 4, 2001, litigation is outside the statute of limitations for this action.  However, the Partnerships have alleged that not only did Lossett conceal facts prior to the litigation but he continued to conceal facts after the institution of litigation in April 2001. Therefore, some of the concealed facts may be within the statute of limitations.  A demurrer lies only where the dates in question are shown on the face of the complaint.  If they are not, there is no ground for demurrer.  See, *United Western Med Ctrs. V. Sup. Ct.* (1996) 42 Cal.App.4[th] 500.  Therefore, the demurrer to the second cause of action is overruled."[87]

After concluding its analysis of the second cause of action, the Court no longer engages in any express further application of the statute of limitations as to other causes of action; rather, it makes merely a passing comment on the matter if at all.  The following from the fourth cause of action (breach of fiduciary duty re: Cape Cod partnership agreement) is illustrative, "[Lossett] argue[s] that this cause of action fails for the same reasons as the first two causes of action. However, I think those two causes of action have been adequately stated.  It will be up to the Partnerships to prove ultimately what affect the erroneous information in PPSI's SEC filings had upon the partnerships."[88]

       **c.**      **Analysis:**

           i.      <u>The Court's Ruling Was Limited</u>.

To be sure, and as the Partnerships point out in their Opposition to the Demurrer, a general demurrer tests only the legal sufficiency of the complaint—nothing more, nothing less. (*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4[th] 968, 994.)  The Court recognized that principle in its Ruling: "A demurrer can be used only to challenge defects that appear on the face of the pleading under attack."  (Ruling, p. 3:21-22 (citing *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318).)  "The plaintiff's ability to prove the allegations is of no concern in ruling on a demurrer. *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213-

---

[86]   Ruling, p. 5: 1-9.

[87]   Ruling, p. 6:24-7:5.

[88]   Ruling, p. 7:21-24.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 39

14." (Ruling, p. 4:7-10.) Thus, it is important to keep in perspective that the Ruling here was on a very discrete issue—testing the legal sufficiency of the claims contained within the SACC; the Court was not called upon to (nor did it) rule outside the bounds of the pleading of the SACC, including as to whether the facts pleaded were accurate or comprehensive.[89]

Given the limited nature of the Ruling, the Partnerships' claims against Arter regarding missing statute of limitations deadlines against Lossett are not inconsistent with the Court's Ruling. With respect to these statutes of limitation issues, the Court's only focus in its Ruling pertained to whether or not the SACC provided a foundation necessary to sustain Lossett's Demurrer, not whether any claims were time-barred based upon evidence outside of the pleaded facts. Moreover, in a demurrer, defects pertaining to the running of the statute of limitations on any claims must appear "clearly and affirmatively" from the dates alleged of the complaint. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403.) In ruling on the first cause of action (breach of fiduciary duty) the Court concludes, "I do not think it has been clearly shown that this cause of action is barred by the statute of limitations."[90] The Court further notes that, "there are no dates in the complaint that would bar this cause of action."[91] Read together, these statements by the Court clearly recognize the possibility that the claim **may** be time-barred but that such has not been "clearly and affirmatively" demonstrated by Lossett and/or that the claim **may** be time-barred based upon facts not alleged in the SACC.

Concerning the second cause of action (constructive fraud), the Court found that, as cited above in subsection 3(b), constructive fraud indeed is limited to a three (3) year statute of limitations and that anything prior (including the April 4, 2001 litigation) is outside the statute.[92] Here, the Court merely found that there were no grounds to sustain the Demurrer as to this cause of action because the dates in question were not found on the face of the SACC. The Court speculated that, based upon the pleaded language in the SACC, "some of the concealed facts may be within the statute of limitations" because the Partnerships alleged in the SACC that not only did Lossett conceal facts prior to the April 4, 2001 litigation, but that he continued to conceal facts after the institution of the April 4, 2001 litigation. This implied that anything prior to May 28, 2001,[93] was out as a matter of law, but that anything beyond that date could support the second cause of

---

[89]  And arguably any of the judicially noticeable documents.

[90]  Ruling, p. 5:15-16.

[91]  Ruling, p. 4:27-28.

[92]  And is therefore supportive of the Partnerships' claim for professional negligence against Arter.

[93]  Three (3) years prior to the filing of Lossett's Complaint on May 28, 2004.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 40

action. In so ruling, the Court recognized that this cause of action ***may*** (but not necessarily would) be viable. The Court effectively punts on this issue alluding to the fact that Lossett did not adequately frame his Demurrer.

Thus, despite overruling Lossett's Demurrer to the Partnerships' SACC on several causes of action, the Ruling does not exonerate Arter and it is not inconsistent with the conclusions that Arter as negligent and that some or all of the claims were in fact time-barred as a consequence of Arter's handling of the matter. The Court's interim demurrer ruling in favor of the Partnerships (on statute of limitations grounds) on Lossett's Demurrer to the SACC is certainly not dispositive of the issue of whether or not any statutes of limitation barred the Partnerships' claims against Lossett; rather, the Ruling was confined to pleading rules and sufficiency of facts pleaded, and in the context of the arguments advanced by Lossett in the demurrer.

ii.     <u>Mistakes Lossett's Attorneys Made In Lossett's Demurrer</u>.

It must also be noted that Lossett's attorneys made a number of significant mistakes in the drafting of Lossett's Demurrer such that the Court never truly had the correct information before it. Had Lossett's Demurrer been more precisely and accurately crafted, the Court very well may have sustained many if not all portions of the Demurrer. Below, I review these mistakes and their significance.

That being said, following this Ruling, a reasonable attorney in the position of Arter would have realized that they had dodged a bullet with this Ruling (at least temporarily). Moreover, a reasonable attorney would have understood that they had survived for the moment, but sooner rather than later the bell would be tolling for Arter since it was obvious Arter had completely blown various statutes of limitation and, along with them, the Partnerships' rights.

<u>First</u>, Lossett's attorneys made the strategic mistake of arguing that all of the claims fell under the three (3) year statute of limitations. There was no attempt by Lossett's attorneys to make an argument in the alternative outlining reasons why, even if the "catch all" four (4) year statute of limitations applied, the Demurrer must be sustained. As such, the issue was never fully briefed for the Court. <u>Second</u>, nowhere in the Demurrer does Lossett even attempt to argue that actual damages were accrued when the Partnerships engaged legal counsel and incurred legal expenses in connection with mitigational efforts relating to the claim against Lossett, thus causing the various statutes of limitation to run. Indeed, Lossett waited until his Reply brief to bring up (for the first time) the issue of these mitigational damages in an apparent attempt to "sandbag" the Partnerships by raising an entirely new argument for the first time in the Reply.[94] <u>Third</u>, the

---

[94]    On a related note, it is worth mentioning that the Partnerships took a position contrary to their current one— namely, that they did not suffer any actual damages until the settlement of the Caremark Action in 2002. (Opposition, p. 8:25-26.) Indeed, the Court picks up on this language and uses it in its Ruling ("The

# PARKER SHUMAKER MILLS LLP
THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 41

Demurrer never makes any reference to Arter and, given the strictures of a demurrer (that is, limited to attacking the sufficiency of that which appears in the four corners of the pleading which are taken as true for demurrer purposes), that could not exploit Arter's imputed knowledge.

        iii.    <u>Conclusion</u>.

It appears that the interim Ruling in favor of the Partnerships on Lossett's Demurrer on statutes of limitation grounds is really a non-issue. There appears to be nothing in Court's Ruling to detract from the conclusions that Arter was negligent and that some or all of the claims became time-barred on the firm's watch. Most importantly, no one at Arter should have taken any solace in Lossett's weak Demurrer being overruled on the statute of limitations grounds. If Arter had not already realized the error of its ways, this Demurrer all but spelled out for them everything it needed to know with respect to a potential claim of professional negligence the Partnerships had a right to assert against it. In my view the death knell had sounded. Moreover, the fact that settlement of the underlying action with Lossett followed the Partnerships' overcoming of the Demurrer is of little consequence. The Partnerships rightly approached settlement of that action on an informed basis as to the statute of limitations issues created by Arter, taking into account all that was relevant to the probably adverse outcome of a statute of limitations defense on Lossett's part, including facts not alleged in the pleadings and arguments which Lossett's attorneys failed to make in the moving papers.[95]

---

Partnerships have also argued that they did not actually sustain damages resulting from Lossett's breach of fiduciary duties until the settlement of the Caremark litigation in 2002, when they were forced to settle for a substantial discount because of Lossett's breach of fiduciary duties.") (Ruling, p. 5:9-13). Also, the Partnerships' acknowledgement that "[a]t the very least, as issue of fact exists as to when the Partnerships suffered actual damages, precluding resolution of the issue on demurrer" (Opposition, p. 8:26-28) is helpful as a mitigating tool should this language be argued against the Partnerships in their claims against Lossett; it recognizes the possibility that actual injury may have occurred earlier than 2002. At any rate, the language does not appear to have been truly relied on by the Court in its Ruling as the Court chided Lossett for his failure to definitively show this action was time-barred. ("I do not think it has been clearly shown that this cause of action is barred by the statute of limitations." (Ruling, p. 5:15-16).) Thus, The Court left very much open whether it would ultimately find the statute of limitations to be a bar.

[95]    It appears that Arter contends that the Partnerships failed to mitigate and acted contrary to their interests in settling the underlying action and the claims affected by the statute of limitations defenses. Both Special Interrogatory Nos. 15 and 16 suggest this approach and the responses to these interrogatories both simply refer back to the responses to Special Interrogatories 2, 3 and 6. The response to Special Interrogatory No. 2 is inadequate to support this claim, noting only in conclusory terms that none of the claims were impacted by the statute of limitations, which is contrary to the conclusions in Arter's own research memoranda. The response to No. 3 refers back to the preceding response and only adds that management made the decisions, which is obvious and besides the point since their decisions was guided by Arter's advice during the period of representation. The response to No. 6 is similarly devoid of facts, in favor of unexplained exclusions. I reserve

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 42

## Further Comments Following Recent Review of Documents

**Writ of Attachment**: It appears that the most time consuming task in connection with the Caremark litigation was the preparation of a proposed Writ of Attachment. Draft after draft of the memorandum of points and authorities and supporting declarations of Groves and Roberts are seen in the file, with a multitude of emails on the subject. The work covers a period of approximately a year.[96] Yet the writ was never filed and the files I reviewed do not provide a clear explanation why, after so much work, after months and months, a motion that was near final several times, was not filed.[97] As late as April the writ had not been filed and, defensively, Arter offered to writ of $40,000 in time on the project.[98]

**Failure to take depositions**: In the course of some 15 months of litigation with Caremark, from the inception of the Caremark case, Arter did not take a single deposition (based on a review of time records, e-mails, correspondence and discovery/court indexes). All discovery conducted by Arter was strictly written, e.g., requests to produce documents and interrogatories. The same is true of defendants. Yet, as of July with the firm still of record, the trial was set for October. As

---

the right to address and express opinions as to these and any other issues which Arter has failed to properly address in its responses to special interrogatories.

[96] In what may be the earliest reference in the time records of Arter, there is a May 16, 2001 entry by Sunkin. Further entry on June 19, 2001.

[97] As late as April 10, Roberts sends an e-mail to Grajewski with cc's to Goldman, Sunkin and others.  He begins "several factors have changed since our meeting with you on April 3 that lead me to request your consideration of advancing forward the timeframe to file our Writ."  He identifies a change to travel plans for Gary Groves and that Caremark has communicated to Sunkin its intention to file another action which will involve parties that are both general and limited partners in these partnerships.  "Let's accelerate the timeframe and file our Writ before Caremark files any other action and let's use the Writ as an offensive tool . . . it is really compelling of our strong position."  Roberts concludes the e-mail with "time is working against these partnerships and delays in filing the Writ are counter productive." The April 3 meeting involved two Arter partners, Harriett Welch and Wayne Grajewski. By then the client had lost confidence in the firm's handling of the case and the firm realized it could not retain the client unless it shifted to a contingency fee arrangement. See April 15, 2002 Grajewski-Rundle memorandum.

[98] See June 12, 2002 Grajewski letter to Dr. Groves recounting that since the contingency fee proposal was rejected on April 25 by Groves the firm had asked to be replaced by reply letter dated April 26. Recounts how the firm agreed to provide damage assessment, and did so, but hasn't heard any feedback from client. Offers to discount $40,000 of the fees associated with the writ of attachment (still not filed). Offers to stay on and cut hourly rates by 10%.

# PARKER SHUMAKER MILLS LLP
THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 43

soon as Miller & Holguin took over, deposition notices immediately issued, with a flurry of notices served by defendants.[99]

**Work up on damages and hiring of experts**: It does not appear that despite the looming October 2002 trial date, Arter had engaged the services of a damage expert—not just to testify but also to assist the firm in identifying recoverable damages and to provide guidance in terms of discovery. Prior to June 2002, all references to expert testimony is limited to the fair market value of the leases and whether they could avoid having an expert give a declaration for purposes of the writ of attachment and whether a client deposition would suffice.[100] The first serious attempt to analyze damages occurred very late in the case.[101] See May 15, 2002 Grajewski memorandum to Roberts providing a $4 million damage analysis.[102] There is also is a July 17, 2002 e-mail from Michelle McAloon at Arter & Hadden to Perry Cameron at Miller & Holguin attaching a memo regarding categories of damages identified in Responses to Interrogatories served by Caremark and PPSI and the documents which support these categories of damages.

---

[99]   There are time entries by Mattfeld for preparing a deposition notice for person most knowledgeable of Caremark on June 29, 2001 and July 17, 2001 but no indication that it was finalized and served. There is an e-mail exchange between Neil Sunkin and Scott Nelson on March 5, 2002 concerning taking depositions in the Caremark case.  According to Nelsons' e-mail, Sunkin wanted to schedule depositions for the end of March (2002) and that there are about sixteen depositions that need to be scheduled.  The individuals contemplated include Bradley Karro, Sara Finley, Paul Stivender, Carol Lyons, Judy Carpenter, Abbey Ingram and Larry Densmore. For reasons unknown, this step was not taken.

[100]   There is a passing reference in a time entry dated May 15, 2001 to engaging an accountant and May 23-24 and June 29, 2001 time entries for calls to people at PriceWaterhouseCoopers and Simpson & Company, all recognized forensic accountants in Southern California, but no indication the purpose or whether they were engaged. In connection with the Rule 6 meeting, there is an entry dated June 14, 2001 by Sunkin re "template for damage calculations." There is an entry for preparing an e-mail to Roberts, by Sunkin, on June 24 re revisions to damage calculations. Other entries for June 15-18 regarding damages, including conferences and at least one call to Roberts. On June 18, 2001 Grajewski records time to doing a memorandum re damages. The next reference to "experts" is April 8, 2002 entry for a call with Roberts and reference to Grubb & Ellis, which presumably related to fair market value of the leases.

[101]   Time entries for late March, 2001 show research into attorneys' fees as damages. There is a time entry for April 3, 2001 regarding a research memorandum "re attorneys' fees." Not clear if this relates to the same issue, in particular, "Tort of Another." One day earlier, there is an internal conference among Arter attorneys re "claims for damages from unconsented assignments."  Such a claim did appear in the Caremark complaint, but also the draft complaint against Lossett which was prepared in early 2002.

[102]   The file contains an April 22, 2002 e-mail attaching a memorandum setting forth terms of the Arter's firm's acceptance of contingency fee proposal made on April 4, with two modifications. This analysis suggests damages may be closer to $3 million, lower than previously thought. This lower damage analysis is not discussed in the Grajewski analysis prepared the next month.

# Parker Shumaker Mills llp
### The Lawyers' Lawyers

Robert M. Gilchrest, Esq.
November 30, 2009
Page 44

**Drafting of complaint against Lossett in early 2002**: Arter did draft a complaint against Lossett, though it was never filed and it is not clear whether the client was advised whether to file or hold back at that point in February 2003.[103] There are a series of e-mails exchanged on February 13, 2002 regarding the drafting of a complaint against Lossett.  The draft complaint attached to the e-mails is in action in the name of Cape Cod West and Hesperia Medical Building named Lossett as a defendant and individually and in his capacity and as Trustee of the Ronald D. Lossett Family Trust, and also Pacific Investments.  The pleading alleges fraudulent concealment but fails to identify how and when Lossett's fraud was discovered. It also alleges mitigational damages (including attorneys' fees), but again fails to identify when such efforts were made and when the damages were incurred.[104]

---

[103]  On February 19, 2002 there were an exchange of e-mails between Sunkin and Roberts about having a meeting and what the agenda would be.  The topics appear to be Writ of Attachment and the Complaint against Lossett. It is not clear whether the meeting took place and if so what was said or decided as a result. As late as April 15, 2002, Arter knew that Groves wanted to sue Lossett over the issue of the shortening of the term of the leases. See Sunkin memorandum dated April 15, 2002, p. 2. **There is no indication this memorandum was shared with the clients**. Sunkin seemed to downplay Groves because he supposedly had such personal animosity against Lossett that it "clouded his judgment." Id. Sunkin also appeared to be of the belief that they needed supportive testimony from Lossett whose cooperation was unlikely if he was sued. Id. pp. 2, 10. One obvious compromise solution, tolling agreement, is not acknowledged. Nor does he analyze what precise testimony was needed by Lossett or even the issues as to which his testimony would be important and why it should be assumed that the testimony would not be given if Lossett was sued concurrently. No consideration appears to be given as to why Lossett might have a vested interest in helping the partnerships prevail in the case, i.e., as it may moot or mitigate his exposure. The April 15 memorandum concludes that there is only a 10% chance of success of defeating the Lossett signed addenda which reduced the lease terms. Id. p. 20. Not clear if the 10% assumes Lossett approval, but if the odds of failure were so high, why risk the ability to recover damages against Lossett? On the other hand, he also suggests that the breach is merely anticipatory and the property could be "relatively easy" to find a replacement tenant and thus damages related to this issue may not be substantial. Id. Not clear whether this analysis was shared with the client.

[104]  The Fourth Cause of Action in the draft complaint against Lossett is for fraud, alleging that Lossett concealed the facts concerning the lease amendments and had Plaintiffs known the true facts they would have taken action to correct the improper amendments and would have been able to pursue remedies against Lossett at an earlier time and further the Plaintiffs would not have suffered the costs and risks of defending Caremark/PPSI's assertions in the Caremark lawsuit regarding the reduced terms of the Cape Cod and Hesperia Leases."  As before, there is no specific indication as to when these were first discovered.

# PARKER SHUMAKER MILLS LLP
### THE LAWYERS' LAWYERS

Robert M. Gilchrest, Esq.
November 30, 2009
Page 45


Very truly yours,

DAVID B. PARKER
Partner

DBP:clka

Enclosure: Resume of David B. Parker

**David B. Parker**
# PARKER SHUMAKER MILLS LLP

801 S. Figueroa Street, Suite 1200
Los Angeles, California 90017
TELEPHONE (213) 622-4441
FACSIMILE (213) 622-1444
E-mail: parker@psmlawyers.com

## BAR ADMISSION

- California (1976)
- U.S. District Courts, California (1977), Hawaii (1988), Western District, Michigan (2005), Middle District, Florida (2005)
- 9th Circuit Court of Appeals (1977)

## EDUCATION
### *University of California at Los Angeles*

- B.A., Major in Latin American Studies (1972)
- Departmental Scholar (Latin American Studies)
- Summa cum laude
- Phi Beta Kappa
- Member, Sigma Chi Fraternity

### *UCLA School of Law*

- J.D. (1976)
- Order of the Coif
- Associate Editor and Note Author, *UCLA Law Review*

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1976 - 1979 | Overton, Lyman & Prince, Associate |
| 1979 - 1995 | Lewis, D'Amato, Brisbois & Bisgaard, Senior Partner |
| 1995 - Present | *Parker Shumaker Mills LLP*, Founding Partner |

## TRIAL EXPERIENCE

Served as sole, lead, or co-lead counsel on more than nineteen (19) jury trials (and a greater number of nonjury trials), in state and federal courts (as well as various judicial, commercial, and *Cumis* arbitration proceedings and Mandatory Fee Arbitration matters), on behalf of plaintiffs and defendants. Trial proceedings involved a wide range of business and professional liability litigation, derivative litigation and shareholder disputes, litigation involving nonprofits and religious entities, malicious prosecution, attorney fee disputes, law firm dissolution and other internal law firm disputes, insurance coverage and bad faith, family law (dissolution, adoption and child custody), partnership disputes, labor and employment law, unfair competition, securities, and intellectual property cases.

## APPELLATE EXPERIENCE

Briefed and/or argued more than 50 appeals and writ proceedings, in state and federal appellate courts, including the following *published* decisions:

- *Gibson, Dunn  & Crutcher v. Superior Court*, 94 Cal.App.3d 347 (1979)
- *Zeavin v. Lee*, 136 Cal.App.3d 766 (1982)
- *Lumpkin v. Friedman*, 131 Cal.App.3d 450 (1982)
- *Chen v. Flemming*, 147 Cal.App.3d 36 (1983)
- *Botos v. Los Angeles County Bar Association*, 151 Cal.App.3d 1083 (1984)
- *Securities Investor Protection Corp. v. Vigman*, 587 F.Supp. 1358 (C.D. Cal. 1984)
- *Employers Reinsurance Corp. v. Phoenix Ins. Co.*, 186 Cal.App.3d 545 (1986)
- *Sukoff v. Lemkin*, 202 Cal.App.3d 740 (1988)
- *Ceriale v. Taback*, 48 Cal. App. 4th 1629 (1996)

{DBP0952.DOC}

- *Harris v. Rudin,* 74 Cal. App. 4th 299 (1999)

Represented the Beverly Hills Bar Association and the Bay Area Bar Association as *amicus curiae* in *Viner v. Sweet*, 30 Cal.4th 1232 (California Supreme Court 2003) and likewise represented the Association of American Physicians and Surgeons, Inc. in *Mileikowsky v. Tenet HealthSystems*, 128 Cal. App. 4th 531 (2nd District Court of Appeal 2005)

## EXPERT WITNESS EXPERIENCE

Served as an expert witness or consultant both for clients and attorneys in legal malpractice, fee arbitrations, contractual arbitrations, and similar cases in state and federal courts, involving standard of care, professional responsibility and ethics, including conflicts of interest, and for insureds in business and professional liability litigation and coverage matters, including bad faith litigation and *Cumis* arbitrations.

## STATE BAR AND JUDICIAL DISCIPLINARY DEFENSE

Represented attorneys and jurists in responding to disciplinary complaints and investigations initiated by the California State Bar, Los Angeles Superior Court, and United States District Court for the Central District.

## PROFESSIONAL AND PUBLIC SERVICE ACTIVITIES

### *American Bar Association*

- Member (1977-present)
- Member, **Section of Corporation, Banking and Business Law** (1977-present)
- Member, **Section of Torts Insurance Practice** (1977 - Present)
- Member, **Section of Litigation** (1991 - Present)

### California State Bar
- Member, Section of Litigation (2001-present)
- Appointed Member of the **Standing Committee on Professional Responsibility and Conduct** (November 2007-present)

### *Los Angeles County Bar Association*
- Member (1982- present)
- Member (1999- present), Chair (2003-2004), Vice Chair (2002-2003), Secretary (2001-03) **Professional Responsibility and Ethics Committee**
- Member (1987 -1991); Chair (1988-90), **Attorneys Errors & Omissions Prevention Committee**
- Member, **Professional Liability Insurance Committee** (1987-90)
- Member, **Group Insurance Programs Committee** (1990-1991)
- Participant, **LACBA Mentor Program** (2003-2006)

### *Association of Business Trial Lawyers*

- Member (1986-present)
- Member, **Board of Governors** (1988-90)
- Co-Chair, **Insurance Committee** (1992-1994)

### *ABOTA* (**American Board of Trial Advocates**)
- Member (2008-Present)

### *Lawyers Professional Liability Bar Association*
- Member (1995- Present)

### *Association of Professional Responsibility Lawyers*

*Resume of David B. Parker*
*November 21, 2009*
*Page 3*

- Member (2005-Present)

### United Scleroderma Foundation

- Member, Board of Directors (1987 - 1996)
- Member, Advisory Board (1996 - 1998 until merger with the Scleroderma Foundation)
- President (1989 - 1991)
- Vice President (1987 - 1988)

### The Scleroderma Foundation

- Founding Member, Board of Directors (January 1998 - February 2009)
- Board Secretary (August 1999 - February 2009)
- Member, Board of Directors of the Southern California Chapter (April 2009 – present)

### Bridges Academy, Inc.

- Member, Board of Trustees (1998 – June 2009)
- Board Secretary (1998 – June 2009)
- Member, Advisory Board (September 2009 to present)

## PUBLIC ACKNOWLEDGEMENTS

"AV" Rated by Martindale-Hubble

Identified as among the California's "Super Lawyers" (*Los Angeles Magazine* and www.superlawyers.com) (2004-2009) (business litigation and professional liability, plaintiffs and defense), and 2009 recognized as one of Southern California's "Top 100" attorneys.

Also identified as one of the leading experts on legal malpractice in "Who You Gonna Call?" in *California Lawyer* (February 2002), "The Lawyers' Lawyers" issue of the Daily Journal's *California Law Business* (November 30, 1998), and in the article "The Malpractice Practice" by Pearl J. Piatt.

Recipient of the "Spirit of Hope Award", November 4, 2006, by the Southern California Chapter of the Scleroderma Foundation.

Recipient of the "2006 Founder's Award", on July 21, 2007, by the Scleroderma Foundation for twenty years of service for the Foundation and one of its predecessors, the United Scleroderma Foundation.

Recipient of an "Out of the Box" award for service since 1998 as member of the Board of Trustees of Bridges Academy, May 12, 2007.

## PUBLICATIONS

| | |
|---|---|
| Co-Author | *Modifying Fee Agreements, or How I Learned to Stop Worrying and Love California Rule of Professional Conduct 3-300*, Los Angeles County Bar Association Update (May 2009) |
| Co-Author | *Recognizing Interests and Avoiding Conflicts* (2008) |
| Co-Author | *Ethical Issues in Class Actions and Derivative Litigation* (2008) |
| Co-Author | *Practicing Law Defensively* (2007) |
| Co-Author | *Ethics: Beware of Opposing Counsel Bearing "Gifts"*, Los Angeles County Bar Association Update (March, 2008) |
| Co-Author | *The Pellican's Mess: Ethical Considerations for Attorneys Who Hired Private Investigators in the Wake of Pellicano* (September 2006) |

| | |
|---|---|
| Co-Author | *"Advising and Defending Corporate Directors and Officers"*, Chapter 12 in *Directors' and Officers' Liability Insurance (CEB 2005 and later supplements)* |
| Co-Author | *The Unknown Ethical Quagmire Under The New Bankruptcy Law*, *(Lorman Educational Services December 2005)* |
| Co-Author | *The Informed Consent Doctrine: What's Good for the Patient is Good for the Client*, Los Angeles County Bar Update (December 2005) |
| Co-Author | *Avoiding Ethical Pitfalls for New Attorneys*, LACBA Survival Guide for New Attorneys (September 2005) |
| Co-Author | *The California Rules of Professional Conduct: The Good, the Bad, and the Utterly Confusing*, Los Angeles County Bar Update (May 2005) |
| Co-Author | *Directors and Officers Liability Insurance: A Handbook for Corporate Executives and Their Counsel* (November 2004), published in connection with CEB Seminar, Protecting Corporate Officers & Directors (November 2004) |
| Co-Author | *Legal Ethics and the Limited Liability Company*, Lorman Educational Services, "LLCs: Advising Small Business Start-Ups and Larger Companies in California" (July-August 2004) |
| Co-Author | *Ethics and Entertainment Law in California: The Essentials*, Film & Television Law Conferences, sponsored by CLE International (June 2004, updated June 2005) |
| Co-Author | *After Attorney Error: What is the Duty to Assist the Former Client in Mitigating Consequences?* Los Angeles County Bar Update (November 2003) |
| Co-Author | *Expert Grilling*, Los Angeles Lawyer (November 2001) |
| Co-Author | *The Never-Ending Story: Malicious Prosecution in California* (January 2001) |
| Co-Author | *Baggage Handling: Conflicts in Law Firm Acquisitions and Mergers*, Quality Assurance Review (Summer 2000) |
| Author | *Practicing Defensive Law in the 1990s* (1996-99) |
| Author | *The Practice of Defensive Law by Corporate Securities Lawyers in the 1990s* (1997), 30th Annual Securities Regulation Conference |
| Author | *Law of Causation in Legal Malpractice Cases*, Consumer Attorneys of California, 34th Annual Convention (1995) |
| Co-Author | *The Law of Directors and Officers Insurance* (1993). |
| Co-Author | *Policy Limits Demands* (1993) |
| Co-Author | *Law Firm Liability Under the Federal Securities Laws*, Insights, Vol. 6, No. 3 (1992) |
| Co-Author | *Vicarious Liability of Law Firms for Member Securities Laws Violations as Lawyers and Directors*, 24th Annual Securities Regulation Seminar (1991) |
| Author | *Current Coverage Issues in Directors and Officers Insurance*, P.L.I. (1991) |
| Author | *Life After Cumis: The Impact of Cumis and Civil Code Section 2860 on Business Litigation*, LACBA Litigation Section Program on "Recent Developments in Business Torts" (1991) |
| Author | *In Defense of the Litigation Privilege*, California Litigation (Winter, 1988) |
| Co-Author | *Confronting the D & O Insurance Crisis: Corporate Manager's Perspective* (1986) |
| Author | *The Role of Liability Insurance in Securities Litigation*, (P.L.I. Securities Litigation: Prosecution and Defense Strategies) (1985) |
| Author | *Directors and Officers Liability Insurance: What You Must Know to Protect Your Client*, (P.L.I., Recent Developments in Securities Litigation) (1984) |
| Co-Author | Note, *Erosion of the Error-in Judgment Rule: Informed Decision-Making and Informed Consent*, Legal Malpractice Committee Newsletter (November, 1981), International Association of Insurance Counsel |

| Co-Author | Note, *Third-Party Indemnity Claims Against Attorneys: The California Rule and Its Evolution*, Legal Malpractice Committee Newsletter (November, 1980), International Association of Insurance Counsel |
|---|---|
| Author | *Attorney Liability Under the Securities Laws After* <u>*Ernst & Ernst v. Hochfelder*</u>, 10 Loyola Los Angeles L. Rev. 521 (1977) |
| Co-Author | *Advising and Defending Corporate Officers and Directors Under the New General Corporation Law*, (CEB, 1977) |
| Co-Author | *Liability Insurance Coverage Under the Securities Laws*, (USC Law Center 4th Annual Corporate Law and Finance Institute, 1976) |
| Co-Author | Note, *Beyond the Client: Attorney Liability to Third Persons*, Legal Malpractice Committee Newsletter (October, 1976), International Association of Insurance Counsel |
| Author | Note, *Juveniles in the Criminal Courts: A Substantive View of the Fitness Decision*, 23 UCLA L. Rev. 988 (1976) |

## LECTURES AND SEMINARS

**Seminar Speaker, Panelist and Lecturer**:

Has spoken at various public and private seminars and study groups attended by practicing attorneys and members of the business and insurance sectors throughout California and the United States, for or sponsored by such organizations as the American Bar Association, California State Bar (Sections on Litigation, Business Law, and Real Estate, the State Bar Annual Conference and Statewide Ethics Symposium sponsored by the Standing Committee on Professional Responsibility and Conduct), Continuing Education of the Bar, The Rutter Group, Practicing Law Institute, Lorman Education Services, CLE International, Association of Business Trial Lawyers, Association of Professional Responsibility Lawyers, Lawyers Professional Liability Bar Association, Southern California Insurance Defense Counsel, George McBurney Business Litigation Inn of Court, Home Insurance Company, Chubb Insurance Company, Los Angeles Country Bar Association ("Nuts and Bolts" program, presentations sponsored by various sections including Litigation, Intellectual Property, Business and Corporations, Real Estate, Labor & Employment, Barristers and for various Committees, including Professional Responsibility and Ethics, Errors and Omissions Prevention), Orange County Bar Association (Insurance Law Section), Century City Bar Association (Litigation Section), Beverly Hills Bar Association (Entertainment Law Section), San Fernando Valley Bar Association, Whittier Bar Association, Philippine American Bar Association, Desert Bar Association, Attorneys Insurance Mutual Risk Retention Group, California Society of CPAs (Los Angeles-Long Beach and Orange County Chapters), Young Presidents Organization, Community Institutions Institute, Mid-Cities Independent Insurance Agents Association, Johnson & Higgins, and various private law firms (listed below); and lectured at legal ethics classes at Southwestern and Loyola Law Schools and family law study groups in Beverly Hills and Whittier.

**Chronological List of Speaking Engagements:**

| 09/14/81 | Lectured on informed consent and judgmental immunity to the Family Law Study Group at the request of S. David Rosenson [members included Bob Brock, Spencer Brandeis, Irwin Buter, Arlene Colman-Schwimmer, Norman Dolin, Manley Fried, Leonard Glusman, Paul Gutman, Godfrey Isaac, Daniel J. Jaffe and Joseph Taback] |
|---|---|
| 03/29/84 | Lectured to the Community Associations Institute on Liabilities of Directors, Officers and Volunteers of Community Non-Profit Associations at CAI Research Foundation Symposium on Community Association Directors and Officers Liability Insurance in San Francisco, CA. Co-panelists: Richard Kennedy (Bennett, Hueston, Kennedy & Mueller from Florham Park, N.J.), Ian Graham (Booth & Simpson) and Doug Kleine (Director of CAI Research Foundation) |
| 04/27/84 | Lectured to the Corporate Law Departments Section and Business Litigation Section of the Century City Bar Association on Officers and Directors Insurance: What You Must Know to Protect Your Clients. Co-panelists: David Kalainoff (Prof. Liability Underwriting Manager for Cameron & Colby) and Ian Graham (Booth & Simpson) |
| 10/25/84 | Lectured to the Community Associations Institute on D & O Policies from a Broker and Carrier's Viewpoint in Philadelphia, Penn. for Symposium of Community Associations Institute National Conference on Community Associations. Co-panelists: Ian Graham (Booth & Simpson), Samuel L. Hager (Jacobson, Goldfarb & Scott from |

Perth Amboy, NJ), Philip S. Downer (Hyatt & Rhoads from Atlanta, GA), Thomas E. Miller (Miller & Gibbs from San Diego, CA) and E. Richard Kennedy (Bennett, Hueston, Kennedy & Mueller from Florham Park, N.J.)

12/10/84     Seminar panelist in Practicing Law Institute program, Recent Developments in Securities Litigation, lecturing on Directors and Officers, Accountant and Attorney Liability Insurance: What You must Know in Order to Protect Your Clients.  Co-panelists: Bruce Vanyo (Wilson, Sonsini, Goodrich & Rosati), Ed Yodowitz (Skadden, Arps, Slate, Meagher, & Flom), Sherrie Savett (Berger & Montague), Tower Snow (Orrick, Herrington & Sutcliffe), John Grasberger (Milberg, Weiss, Bershad, Specthrie & Lerach)

01/26/85     Seminar panelist on Sweaty Palms: Dealing with the Policy Limits Demand at the 24th Annual Seminar sponsored by Association of Southern California Defense Counsel.  Co-panelists: Ray Cotkin (Cotkin & Collins) and Kelley Beck (Hawkins, Schnabel & Lindahl)

06/14/85     Lectured to Mid-Cities Independent Insurance Agents Association at the request of Curt Jacobson of Gold Insurance Agency on malpractice prevention

10/17/85     Lectured to the Community Associations Institute sponsored National Conference on Community Associations in Denver, Colorado on The Directors and Officers Liability Policy--Coverage Issues--Litigation of Policy Suits with Ian Graham (Booth & Simpson), Richard Kennedy (Bennett, Hueston, Kennedy & Mueller from Florham Park, N.J.), Barbara Wick (Condominium Insurance Specialists of America), Professor Katherine Rosenberry (California Western School of Law, San Diego, CA), Marshall N. Dickler (Marshall N. Dickler, Ltd.)

10/03/85     Seminar panelist in Practicing Law Institute program, Securities Litigation: Prosecution and Defense Strategies, lecturing on the Role of Liability Insurance in Securities Litigation.  Co-Panelists: Co-panelists: Bruce Vanyo (Wilson, Sonsini, Goodrich & Rosati), Ed Yodowitz (Skadden, Arps, Slate, Meagher, & Flom), Sherrie Savett (Berger & Montague), Tower Snow (Orrick, Herrington & Sutcliffe), Kenneth Heitz (Irell & Manella)

04/24/86     Seminar panelist for Intellectual Property and Unfair Competition Sections of the LACBA on Litigation Against Lawyers in the Intellectual Property Field.  Co-panelists: William F. Flahaven and Charles J. Schufreider (Barton, Klugman & Oetting)

05/09/86     Seminar panelist for the Eighth Annual Spring Program of the Business Law Section of the State Bar of California on The Liability Crisis, on the subject of The Impact of the Crisis on Lawyers. Co-panelists: Robert A. Chick (President of Lawyers Mutual Insurance Company) and George V. Genzmer, III, (Murchison & Cumming)

05/21/86     Lectured on Malpractice Crisis: Avoiding Malpractice Claims Against Accountants at seminar sponsored by the Orange County/Long Beach Chapter of the California Society of Certified Public Accountants

09/26/86     Seminar panelist at Symposium, Child Care: A Cost of Doing Business sponsored by City of Irvine, The Irvine Company, the Industrial League of Orange County and the AMI/The Irvine Medical Center, on topic of Liability and Tax Implications of Child Care

10/26/86     Moderator and seminar panelist on Scientific Jury Selection and Persuasion as part of the Thirteen Annual Seminar of the Association of Business Trial Lawyers on The State of the Art Trial: Innovative Use of Experts and Trial Techniques in Maui, Hawaii. Co-panelists: Maxwell Blecher (Blecher & Collins), Max Gillam (Latham & Watkins), Dr. Philip K. Anthony (Litigation Sciences), Edward Bodaken (Bodaken & Associates), and U.S. District Judge Harry Hupp

11/13/86     Lectured on liability and insurance considerations as part of a panel on Staying Private, as part of the 1986 Chief Executive Conference on Capital sponsored by Lewis, D'Amato, Brisbois & Bisgaard.  Co-panelists: David T. Thompson (Deloitte, Haskins & Sells) and Kenneth T. Friedman (President of HLHZ Capital)

11/20/86     Lectured on Directors and Officers Liability Insurance: How to Buy It, Where to Buy It, How to Avoid Losses at Insurance Seminar sponsored by Young Presidents Organization in Los Angeles, CA

1987         Seminar panelist on Attorney Malpractice Prevention sponsored by the Attorneys Errors & Omissions Prevention and Insurance Committees of the Los Angeles County Bar Association.  Co-panelists: Larry Feldman, Arnold Gold, Ellen Peck

11/00/87     Lectured at Litigation Night Dinner Symposium for the Los Angeles-Long Beach Chapter of the California Society of CPAs, addressing liabilities of accountants in securities litigation

02/25/88     Seminar panelist on Recent Developments in Securities Class Actions, sponsored jointly by the Business and Corporations Law Section and the Litigation Section of the Los Angeles County Bar Association, together with

|  | William S. Lerach (Milberg, Weiss, Bershad, Specthrie & Lerach) and Bruce G. Vanyo (Wilson, Sonsini, Goodrich & Rosati) |
|---|---|
| 04/05/88 | Lectured at seminar sponsored by the Insurance Law Section of the Orange Country Bar Association on recent development in Directors and Officers Liability Insurance |
| 04/12/88 | Seminar panelist for seminar sponsored by the Association of Business Trial Lawyers, Legal Malpractice: To Sue or Not to Sue? That is the Question.  Co-panelists: District Court Judge John Davies, Los Angeles Superior Court Judge Jack Tenner, Harvey Saferstein (Irell & Manella), S. Thomas Pollack (Irell & Manella) and Robert M. Meyer (Loeb & Loeb) |
| 09/26/88 | Seminar panelist at the 1988 State Bar Meeting Legal Opinions in Business Transactions.  Co-panelists: Paul D. Freeman, John Hartigan (Morgan, Lewis & Bockius), Thomas Kellerman (Brobeck, Phleger & Harrison), Ronald Loeb (Irell & Manella) |
| 02/14/89 | Lectured to the claims department for Chubb Insurance Company in Orange County on policy limits demands |
| 10/00/89 | Seminar panelist on malpractice prevention sponsored by Home Insurance Company. Co-panelist: Jeffrey Smith, co-author of *Legal Malpractice* (Atlanta, GA) |
| 04/24/90 | Seminar panelist on Recent Developments Concerning Attorneys Liability in Business Transactions, as part of the 1990 Glendon Tremaine Symposium on Recent Developments of Interest to the Business Lawyer, sponsored by the Corporation and Business Law Section of Los Angeles County Bar Association.  Co-panelists: Dean B. Herman (Ervin, Cohen & Jessup) and Teresa M. Quinn (Lillick & McHose) |
| 09/17/90 | Lectured to the Litigation Services Department of Coopers & Lybrand on Expert Witnesses: the Good, the Bad and the Ugly, Los Angeles, CA |
| 01/00/91 | Seminar panelist in Practicing Law Institute program, Insurance, Excess and Reinsurance Coverage Disputes 1991, lecturing on Current Coverage Issues in Directors and Officers Insurance.  Co-panelists: Thomas Newman (Bower & Gardner, New York), Curtis Caton (Heller, Erhman, White & McAuliffe), Scott Conley (Sedgwick, Deitert, Moran & Arnold), Raoul Kennedy (Crosby, Heafey, Roach & May), Robert Zeavin (Buchalter, Nemer, Fields & Younger) |
| 03/00/91 | Lectured to the law firm of Armstrong, Hendler & Hirsch on requirements for written fee agreements and conflicts of interest for entertainment lawyers |
| 04/24/91 | Moderated the 1991 Glendon Tremaine Symposium on Recent Developments of Interest to the Business Lawyer, sponsored by the Business and Corporations Law Section of the Los Angeles County Bar Association, on the topic of Recent Developments Concerning Professional Liability in Business Transactions. Co-panelists: Wayne Baliga (Counsel to AON Corporation), Irving Einhorn, Dean Herman (Ervin, Cohen & Jessup), and Thomas S. Loo (Bryan Cave) |
| 00/00/91 | Seminar panelist on Recent Developments in Business Torts, sponsored by the Litigation Section of the Los Angeles County Bar Association with Richard Stone (Sheppard, Mullin, Richter & Hampton), Robert Mangels (Jeffer, Mangels, Butler & Marmaro), and Michael Hennigan (Howrey & Simon), lecturing on Life After Cumis: The Impact of Cumis and Civil Code Section 2860 on Business Litigation |
| 10/30/91 | Seminar panelist at the 24th Annual Securities Regulation Seminar co-sponsored by the Business and Corporations Law Section of LACBA together with SEC and California Department of Corporations.  Co-panels: Bob Carlson (Paul, Hastings, Janofsky & Walker), Gavin Miller (Brobeck, Phleger & Harrison), and C. Douglas Kranwinkle (O'Melveny & Myers), speaking on vicarious liability of law firms for member securities law violations as lawyers and directors |
| 02/05/93 & 02/01/93 | Seminar panelist on Recent Developments in Insurance Law sponsored by Lorman Business Center, Inc. Co-panelists, Joseph K. Hegedus (Lewis, D'Amato, Brisbois & Bisgaard), Ray Cotkin and Steve Paine (Cotkin & Collins) |
| 3/13/93 | Lectured to the Litigation Department of Loeb & Loeb on The Perils and Pitfalls of Malpractice for Business Litigators |
| 00/00/93 | Seminar panelist on business insurance sponsored by Johnson & Higgins.  Co-panelist: Kirk Pasich (Hill, Wynn, Troope & Meissinger) |

*Resume of David B. Parker*
*November 21, 2009*
*Page 8*

| | |
|---|---|
| 04/13/94 | Seminar panelist at the Glendon Tremaine Seminar on Recent Developments in Ethics and Professional Liability for Corporate and Securities Lawyers, on Ethical Considerations in Rendering Legal Opinions. Co-panelists Robert A. Meyer (Loeb & Loeb) and James W. Mercer (Howrey & Simon) |
| 05/31/95 | Seminar panelist on Professional Liability, sponsored by the Rutter Group.  Co-panelists: with Hon. Valerie Baker (Los Angeles Superior Court), Hon. Zerne Haning (Justice, First District Court of Appeal), Andra Green (Irell & Manella) in Newport Beach, CA |
| 11/16/95 | Seminar panelist on Consumer Attorneys of California, 34th Annual Convention, San Francisco, lecturing on Law of Causation in Legal Malpractice Cases.  Co-panelists: Steve Rubin (Rubin & McGonigle), Bruce Bunch (Kontos & Bunche) |
| 11/21/95 | Seminar panelist on Law of Causation in Legal Malpractice Cases, for Lawyers Professional Liability Bar Association |
| 11/21/95 | Seminar panelist on Recent Developments in D & O Insurance, presented to legal department of California Federal Savings |
| 11/15/96 | Seminar panelist on Practicing Defensive Law in the 1990's, presented to Troy & Gould. |
| 05/01/97 | Seminar panelist on Settling Complex Business Litigation, George McBurney Inn of Court, Los Angeles, CA, lecturing on partial settlements of class action and other business litigation, the role of insurance, and pitfalls for practitioners; co-panelists: Hon. Andrew J. Wistrich (Judge-Magistrate United States District Court Central District of California), Hon. Bruce E. Mitchell (Commissioner of Los Angeles Superior Court, assigned to Class Action Department), Jeff S. Westerman (Milberg Weiss Bershad Hynes & Lerach), and Derek Hunt (Troy & Gould) |
| 10/24/97 | Seminar panelist on The Practice of Defensive Law by Corporate Securities Lawyers In The 1990's, presented at the 30th Annual Securities Regulation Conference sponsored by the Business Law Section of the Los Angeles County Bar Association, the Securities and Exchange Commission, California Department of Corporations, and NASD.  Other panelists, William McLucas (Director, Division of Enforcement for the Securities and Exchange Commission), and Patrick Coughlin (senior trial counsel for Milberg, Weiss, Bershad, Hynes & Lerach) |
| 05/06/98 & 06/11/98 | Seminar panelist on Protecting Directors and Officers From Liability, sponsored by California Continuing Education of the Bar and State Bar Business Law Section, on topic of Directors and Officers Liability Insurance and Corporate Indemnification.  Co-panelists: William Gould and Joseph Troy (Troy & Gould), Ronald M. Loeb (Irell & Manella), Neal Brockmeyer (Heller, Ehrman, White & McAuliffe) |
| 06/03/99 | Lectured, Practicing Defensive Law in the 1990's, presented to Troy & Gould |
| 07/13/99 | Lectured on management of litigation risks to Los Angeles Chapter, Young Executives Organization |
| 10/22/99 | Seminar panelist and moderator on How to Avoid Malpractice in Securities Transactions, 32nd Annual Securities Regulation Conference sponsored by Los Angeles County Bar Association Business and Corporations Law Section, State Bar Business Law Section, Securities & Exchange Commission, California Department of Corporations, National Association of Securities Dealers, North American Securities Administrators Association, Inc. Co-panelists: Joseph Troy (Troy & Gould), Ellen Peck |
| 10/20/00 | Seminar panelist and moderator on The Pearls and Perils of Investing with Clients, 33rd Annual Securities Regulation Conference sponsored by Los Angeles County Bar Association Business and Corporations Law Section, State Bar Business Law Section, Securities & Exchange Commission, California Department of Corporations, National Association of Securities Dealers, North American Securities Administrators Association, Inc. Co-panelists: Don Bradley (Wilson, Sonsini, Goodrich &  Rosati), Ellen Peck |
| 10/26/00 | Lectured at Voyage Into the Vagaries, Virtues and Vulgarities of Insurance Defense, presented to the Beverly Hills Bar Association.  Co-speaker:  Diane Karpman |
| 01/16/01 & 01/23/01 | Seminar panelist on Never-End Story: Malicious Prosecution in California, Association of Business Trial Lawyers (Santa Monica and Los Angeles, CA, respectively); Co-Panelist with John Amberg, Hon. Harvey Schneider, and Hon. Valerie Baker |
| 04/22/01 | Seminar panelist on Malpractice Tips for Real Estate Lawyers, 20th Annual Real Property Retreat, sponsored by the Real Estate Section of the State Bar of California (Silverado Country Club & Resort, CA); Co-Panelist: Karen M. Goodman |

*Resume of David B. Parker*
*November 21, 2009*
*Page 9*

| | |
|---|---|
| 11/29/01 | Seminar panelist on Legal Intimidation: the Ethical Challenge, sponsored by Litigation Section of the Beverly Hills Bar Association (Beverly Hills, CA); Co-Panelist: Jeffrey A. Tidus and Shirley Deutsch |
| 03/20/02 | Lectured on Cross-Examination of Legal Malpractice Experts, sponsored by the Lawyers Professional Liability Bar Association (Los Angeles, CA). |
| 06/19/02 | Lectured on Malicious prosecution, sponsored by the Lawyers Professional Liability Bar Association (Los Angeles, CA); Co-panelists Kenneth Feldman (Lewis, D'Amato, Brisbois & Bisgaard), Edith Matthai (Robie & Matthai). |
| 08/03/02 | Seminar panelist on Protecting Directors and Officers From Liability in the Post-Enron Environment, sponsored by California Continuing Education of the Bar; Co-panelists: William Gould (Troy & Gould), Kent Graham (O'Melveny & Myers), Neal Brockmeyer (Heller, Ehrman, White & McAuliffe) |
| 12/07/02 | Seminar panelist on "Nuts & Bolts: Basic Litigation Skills: Essential Tools for Lawyers", sponsored by Los Angeles County Bar Association, "A Tool Box for Malicious Prosecution"; Co-panelists, Diane Karpman and Danny T. Morin |
| 11/01/03 | Seminar panelist on Recent Developments In Ethics for Litigators, Desert Bar Association; Co-panelist, Louisa Lau. |
| 12/03/03 | Seminar Panelist on Recent Developments in Ethics for Litigators, Los Angeles County Bar Association Trial Practice Inn of Court; Co-panelist, Louisa Lau |
| 12/06/03 | Seminar panelist on "Nuts & Bolts: Basic Litigation Skills: Essential Tools for Lawyers", sponsored by Barristers of the Los Angeles County Bar Association, entitled "A Tool Box for Malicious Prosecution"; Co-panelists, Diane Karpman and Danny T. Morin |
| 01/10/04 & 01/30/04 | Seminar panelist on "Getting in and Getting Out: Avoiding Malpractice in the Representation Process," sponsored by CEB; Co-Panelists: John W. Amberg and Diane Karpman. |
| 02/18/04 | Lectured on "New CACI Jury Instructions in Legal Malpractice Cases," presented to the Lawyers Professional Liability Bar Association |
| 06/21/04 | Lectured on *Ethics and Entertainment Law in California: The Essentials*, Film & Television Law Symposium, sponsored by CLE International (June 2004) |
| 11/20/04 & 12/03/04 | Seminar panelist on "Advising Corporate Officers and Directors in a Post-Sarbanes World, sponsored by Continuing Education of the Bar, with co-panelists James Levin and Dale Short. |
| 11/24/04 | Seminar panelist on Responding Ethically And Effectively To Hardball Tactics, as part of *Ethics 2004-Keeping Current in a World of Change*, sponsored by The Professional Responsibility and Ethics Committee of the Los Angeles County Bar Association, with co-panelist, Jeffrey A. Tidus. |
| 12/01/04 | Seminar panelist on Recent Developments in Ethics for Litigators, sponsored by Los Angeles County Bar Association Trial Practice Inn of Court; Co-panelist: Louisa Lau |
| 01/19/05 | Seminar panelist on Annual Entertainment Law Update, Legal Ethics, sponsored by Beverly Hills Bar Association; Co-Panelist: Richard S. Reisberg. |
| 02/08/05 | Seminar panelist on Recent Developments in Ethics, sponsored by Whittier Bar Association; Co-panelist, Louisa Lau |
| 06/24/05 | Seminar panelist on *Ethics and Entertainment Law in California: The Essentials*, Film & Television Law Symposium, sponsored by CLE International |
| 08/10/05 | Seminar panelist on Recent Developments, Whittier Family Law Study Group; co-panelist, Louisa Lau |
| 09/15/05 | Seminar panelist at Legal Roundtable regarding Handling Complex Legal Malpractice Cases, sponsored by State Bar "Big News" publication (co-panelists, John A. Girardi, Diane L. Karpman, Carol D. Kuluva, Robert K. Sall, Hon. Margaret M. Grignon and John M. Cotkin) |
| 09/24/05 | Lectured at Protect Yourself: Zone Out, presentation to the 2nd Annual Conference of Filipino American Lawyers of California |
| 12/10/05 | Seminar panelist on *Fee Disputes*, as part of *Ethics 2004-Keeping Current in a World of Change*, sponsored by |

*Resume of David B. Parker*
*November 21, 2009*
*Page 10*

The Professional Responsibility and Ethics Committee of the Los Angeles County Bar Association, with co-panelist, Ellen Pansky.

12/16/05    Seminar panelist on *The Unknown Ethical Quagmire Under The New Bankruptcy Law*, Understanding the Bankruptcy Reform Act of 2005, sponsored by Lorman Educational Services (co-panelist, Jayesh Patel)

01/11/06    Seminar panelist on *Current Ethics Issues in Insurance Law and Practice*, Quisenberry Law Firm Seminar, Insurance Bad Faith Litigation in an Era of Tort Reform (co-panelists, John Quisenberry and Gerald Knapton)

01/21/06    Seminar Panelist on "Nuts & Bolts: Basic Litigation Skills: Essential Tools for Lawyers", sponsored by Barristers of the Los Angeles County Bar Association, entitled "A Primer: Practical Aspects of Professional Responsibility—Issues of Disqualification, Discipline and Defense to Malpractice Claims"; Co-panelist, Danny T. Morin

05/06/06    Seminar panelist on "Using Client Secrets—Reconciling the Duty of Confidentiality with a Lawyer's Right to Defend Himself or Others", Tenth Annual Statewide Ethics Symposium, presented by State Bar of California Committee on Professional Responsibility and Conduct, University of Santa Clara; Co-panelists: David M. Jargiello, Robert K. Sall, Donald E. Bradley, Frances M. O'Meara.

08/01/06    Seminar panelist on "Damages or Disqualification? Civil Liability for Conflicts of Interest" sponsored by Association of Professional Responsibility Lawyers, Santa Monica, CA; Co-panelists: David P. Atkins and William Freivogel.

09/09/06    Seminar panelist on "Ethical Fallout of Technology," as part of 2006 Institute of Entertainment Law and Business, sponsored by USC Gould School of Law and Beverly Hills Bar Association; Co-panelists: Kevin E. Mohr, Heather Rosing, Judith Gilbert.

09/29/06    Lectured on *The Pellican's Mess: Ethical Considerations for Attorneys Who Hired Private Investigators in the Wake of Pellicano*, Film & Television Law Symposium, sponsored by CLE International

12/06/06    Lectured on *The Unknown Ethical Quagmire Under The New Bankruptcy Law*, Bankruptcy in California, sponsored by Lorman Educational Services (co-panelist, William K. Mills)

12/09/06    Seminar panelist on *Bound by the Oath—Limits on a Lawyer's Right of Self-Defense*, as part of **Ethics 2006-Cutting Edge Issues**, sponsored by The Professional Responsibility and Ethics Committee of the Los Angeles County Bar Association, with co-panelists, Diane Karpman and Joel Osman.

01/16/07    Seminar panelist on "Ethical Fallout of Technology," as part of the Beverly Hills Bar Association Entertainment Law Extravaganza; Co-panelists: Kevin E. Mohr, Heather Rosing, Judith Gilbert.

01/23/07    Seminar panelist on *Current Ethics Issues in Insurance Law and Practice*, Quisenberry Law Firm Seminar, Insurance Bad Faith Litigation in an Era of Tort Reform (co-panelists, John Quisenberry, Gerald Knapton and Lourdes Dearmas)

01/27/07    Seminar panelist on "Nuts & Bolts: Basic Litigation Skills: Essential Tools for Lawyers", sponsored by Barristers of the Los Angeles County Bar Association, entitled "A Primer: Practical Aspects of Professional Responsibility—Issues of Disqualification, Discipline and Defense to Malpractice Claims"; Co-panelist, Danny T. Morin

07/27/07 &    Seminar panelist on Real Estate Litigation, sponsored by Lorman Educational Services in Santa Ana and
09/12/07    Pasadena, CA; co-panelists: Elaine B. Alston, Mark A. Ross and Uzzell S Branson III.

09/26/07    Lectured on "Class Action Litigation Ethics" as part of the seminar New Developments in Class Action Litigation, sponsored by The Quisenberry Law Firm

09/27/07    Seminar panelist on "Ethical Fallout of Technology," as part of the 2007 State Bar Annual Meeting in Anaheim, CA; Co-panelists: Kevin E. Mohr, Heather Rosing, Judith Gilbert.

01/26/08    Seminar panelist on "Nuts & Bolts: Basic Litigation Skills: Essential Tools for Lawyers", sponsored by Barristers of the Los Angeles County Bar Association, entitled "A Primer: Practical Aspects of Professional Responsibility—Issues of Disqualification, Discipline and Defense to Malpractice Claims"; Co-panelists, Diane Karpman and William K. Mills

01/29/08    Seminar panelist on  "Don't Lose Your License or Your Savings," sponsored by Real Estate Section of the Beverly Hills Bar Association; co-panelist, Ellen Pansky

03/06/08    Seminar panelist at The Twenty Eighth Annual Labor and Employment Law Symposium, sponsored by Los Angeles County Bar Association, "*Liens and Taxes and Bankruptcy: Oh My*!, along with co-panelists Lester

Jones, Ted Cohen and Robert W. Wood

05/03/08    Seminar panelist on "Ethical Issues in Class Actions and Derivative Litigation", Twelfth Annual Statewide Ethics Symposium, presented by State Bar of California Committee on Professional Responsibility and Conduct, University of San Francisco; Co-panelists: Diane Karpman and Shawn Harpen

09/26/08    Seminar panelist on "Recognizing Interests and Avoiding Conflicts", as part of the 2008 State Bar Annual Meeting in Monterey, CA; co-panelists: Brian Forbes and Dan Carroll

01/07/09    Lectured on "Best Practices to Stay Out Of Bar Court", San Fernando Valley Bar Association

01/23/09    Lectured on *Ethics: Considerations for Working with Distress Properties*, Real Estate Restructuring, sponsored by CLE International

01/24/09    Seminar panelist on "Nuts & Bolts: Basic Litigation Skills: Essential Tools for Lawyers", sponsored by Barristers of the Los Angeles County Bar Association, entitled "Blockbuster Ethics Cases: Things You Need to Know to Stay Out of Trouble - Crucial Tips to Prevent Malpractice." Co-panelists: Ellen Pansky and William K. Mills.

04/23/09    Seminar panelist on "Laterally Challenged: Working Your Way Through the Ethical Minefield", sponsored at the Spring 2009 ABA National Legal Malpractice Conference, sponsored by the Standing Committee on Lawyers' Professional Liability. Co-panelists: Lucian T. Pera, W. Donald Cox and Thomas Fitzgerald.

05/02/09    Seminar panelist on "Advance Absolution: Ten Deadly Sins in Attorney-Client Engagement Agreements and How to Avoid Them", Thirteenth Annual Statewide Ethics Symposium, presented by State Bar of California Committee on Professional Responsibility and Conduct, University of San Francisco; Co-panelists: Dan L. Carroll, Heather Rosing and David Cameron Carr

09/11/09    Seminar panelist on "Avoiding Involuntary Pro Bono Work: Form the Attorney-Client Relationship and Collecting Fees", as part of the 2009 State Bar Annual Meeting in San Diego, CA; co-panelists: Dan Carroll, Wendy Mazzarella, Jeffrey Tidus

10/16/09    Seminar panelist on "General Practice 101: Avoiding Solo/Small Firm Ethical Traps" sponsored by ABA General Practice, Solo & Small Firm Division Fall Meeting; co-panelist, William K. Mills

10/17/09    Seminar panelist on "Ethical Paradigms For 2009: Navigating Ethics & Thriving In This Contracting, Increasingly Mobile & Hyper-Competitive Legal Marketplace" as part of 2009 Institute of Entertainment Law and Business, sponsored by USC Gould School of Law and Beverly Hills Bar Association; co-panelists Robert K. Sall, Carol Buckner, Judi Gilbert

11/19/09    Seminar panelist on "Lawyer-Client Confidentiality: The Meaning of "At Every Peril," as part of Orange County Bar Association sponsored seminar, Legal Malpractice and How to Avoid it; co-panelists Eugen C. Andres, Gregory H. Halliday, Mitchell F. Mulbarger, Ellen Peck and Robert S. Sall

1995-       Lecturer on *Practicing Law Defensively*, a loss prevention program first presented under the auspices of Attorneys
Present     Insurance Mutual Risk Retention Group to certain of its member firms and later offered to other law firms, all of whom are noted below:

        Loeb & Loeb (3/17/93 and 4/15/05)
        Rutan & Tucker (5/17/97)
        Cox, Castle & Nicholson (5/22/97)
        Stradling, Yocca, Carlson & Rauth (9/11/97)
        Berliner Cohen (11/6/97)
        Buchalter, Nemer, Fields & Young (3/8/98)
        Pircher, Nichols & Meeks (6/16/98 and 2/1/03)
        Luce Forward Hamilton & Scripps (6/19/98)
        Rosenfeld Meyer & Susman (1/13/99)
        Troy & Gould (11/15/96, 6/3/99 and 5/10/01)
        Fiore Racobs & Powers (5/20/00)
        Riordan & McKenzie (4/3/03)
        Baum Hedlund (4/22/04)
        Squire, Sanders & Dempsey LLP (8/04/05)
        Jackson, Demarco, Titus & Peckenpaugh (10/28/05)

*Resume of David B. Parker*
*November 21, 2009*
*Page 12*

Ropers Majeski Kohn & Bentley (3/9/07)
SulmeyerKupetz (8/20/07)
Allen Matkins Leck Gamble & Mallory (12/11/08)
Khorrami, Pollard & Abir (4/8/09)
Hunt Ortmann Palffy Nieves Lubka Darling & Mah, Inc. (8/20/09)
Zuber & Taillieu LLP (9/2/09)

# REPRESENTATIVE CLIENTS OVER PAST 33 YEARS

**Major Law**

- Gibson, Dunn & Crutcher, LLP
- Latham & Watkins
- Pillsbury, Madison & Sutro, LLP (now Pillsbury Winthrop)
- Morrison & Foerster
- Bryan Cave, LLP
- Loeb and Loeb
- Riordan & McKinzie
- Katten Muchin Rosenman
- Hennigan, Bennett & Dorman
- DeCastro, West & Chodorow
- Kindel & Anderson
- Jeffer, Mangels, Butler & Marmaro
- Nossaman, Guthner, Knox & Elliott LLP
- Lyon & Lyon
- Buchalter, Nemer, Fields & Younger
- Rutan & Tucker
- Robinson, Diamant & Wolkowitz
- Mitchell, Silberberg & Knupp
- Troy & Gould
- Wyman, Bautzer, Kuchel & Silbert
- Sedgwick, Detert, Moran & Arnold
- Fiore, Racobs & Powers
- Cox, Castle & Nicholson
- Crosby Heafey Roach & May LLP (now Smith Reed)
- Hill, Farrer & Burrill
- Manatt Phelps & Phillips
- Kirkpatrick & Lockhart LLC (now K & L Gates)
- Lewis, Brisbois Bisgaard & Smith LLP
- Thelen, Reid & Priest LLP
- Knobbe, Martens, Olson & Bear
- KNR Law Group
- Folger & Levin
- Wilson, Elser, Edelman & Dicker
- Jackson, DeMarco, Tidus & Peckenpaugh, PC
- Baum Hedlund
- Hunt, Ortmann, Blasco, Palffy & Rossell
- SulmeyerKupetz, a Professional Corporation
- Newmeyer & Dillion LLP
- Speiser Krause

**Insurers and Insurance Agencies (including *Cumis* representations)**

- Travelers Insurance Company
- MGIC Indemnity Corporation

*Resume of David B. Parker*
*November 21, 2009*
*Page 13*

- Orion Group
- American International Group
- Coregis Insurance Group (fka Crum & Forster)
- Cameron & Colby
- AON Group
- Golden Eagle Insurance Company
- CNA Insurance Companies
- Home Insurance Company
- Chubb Group (including Executive Risk)
- Lawyers Mutual Insurance Company
- Attorneys Insurance Mutual Risk Retention Group
- Old Republic Insurance Company
- State Farm Insurance Company
- Farmers Group of Insurance Companies
- GEICO
- Shand Morahan/Evanston Insurance Company
- Lloyd's of London
- Oxford Insurance Company
- Legion Insurance Company
- St. Paul Fire & Marine
- Ranger Insurance Company
- Executive Risk Indemnity, Inc.
- LTL Insurance Services, Inc.
- Monitor Liability Managers, Inc.
- Attorneys Insurance Mutual Risk Retention Group
- Midland National Life Insurance Company
- AON Risk Management
- Attorneys' Liability Assurance Society
- Admiral Insurance Co.
- Fireman's Fund

**Businesses**

- Tandon Corporation
- American Multiline Corporation
- Baby Treasures, Inc.
- Alper Development
- Len Sheridan Toyota
- American Wireless Networks
- JM Temporary Services & Affiliates
- Inteplast Corporation
- Global Master Apparel, Inc.
- Amplicon, Inc. (now known as California First National Bank Corp.)
- Hawker-Pacific
- Wiz Technology
- European Benefits Administrators
- Gibralt Capital Corporation
- Hanil Construction Co. Ltd.
- Hanil Cement Manufacturing Ltd.
- Siemens
- Golden Den, Inc.
- GV Diversified
- AmerisourceBergen
- Great American Ink
- Tri/Sam Development, Inc.
- Micom Circuits, Inc.
- Bridges Academy, Inc.

*Resume of David B. Parker*
*November 21, 2009*
*Page 14*

- Regency Outdoor Advertising
- Automobile Club of Southern California
- Mylan Labs
- Henkels & McCoy
- LawFund Management Group, LLC
- City of Hope
- DAS Corporation
- WeBillCards
- Cove Management Partners LLC
- Prospect Medical Holdings, Inc.
- Kleinfelder, Inc.
- Staar Surgical, Inc.
- Advanced Arm Dynamics, Inc.
- Allied Industries, Inc.
- Antran Inc. (Crustacean Restaurant, Beverly Hills)
- Ecogas, Inc.
- Gilmore Associates
- Investors Equity Life Holding Company, Inc.
- Centex Homes, Inc.

**Labor Unions**

- Local 1442, United Food and Commercial Workers Union
- Local 659, International Alliance of Theatrical and Stage Employees

**Non-Profits**
- Scleroderma Foundation
- Bridges Academy
- Oriental Mission Church

**Entertainment**

- Brother Records, Inc. (The Beach Boys)
- Virgin Records, U.S.A.
- Paula Abdul
- John Fogerty
- Michael Diamond ("Mike D" of Beastie Boys)
- William Devane
- Morton Downey, Jr.
- Michael Bolton
- Arnold Rifkin/Cheyenne Enterprises LLC (agent and producer)
- Lee Solters (publicist)